UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MAURICE B. PETTIFORD,      )
                      )
         *Plaintiff,*    )
                      )
      v.             )         Civil No. 05-2082 (ESH)
                      )
SECRETARY OF THE NAVY,    )
                      )
        *Defendant.*   )         Judge Huvelle

STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT
OF CROSS-MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO MOTION TO DISMISS

Eugene R. Fidell (112003)
Matthew S. Freedus (475887)
Charlotte E. Cluverius (493655)
Feldesman Tucker Leifer Fidell LLP
2001 L Street, N.W., Second Floor
Washington, DC 20036
(202) 466-8960

*Attorneys for Plaintiff*

February 9, 2006

Table of Contents

*Page*

Introduction ................................................................................................1

Administrative Record ...............................................................................2

Governing Statute and Regulations...........................................................5

Question Presented .....................................................................................5

       IS THE BCNR'S DECISION ARBITRARY AND CAPRICIOUS, UNSUPPORTED BY SUBSTANTIAL EVIDENCE, AND CONTRARY TO LAW?

Statement of Facts .....................................................................................5

Standard of Review ...................................................................................14

Argument..................................................................................................15

I.     THE BCNR'S DECISION IS ARBITRARY AND CAPRICIOUS, UNSUPPORTED BY SUBSTANTIAL EVIDENCE, AND CONTRARY TO LAW ..........................................................15

    A. It fails to explain how it was dealing with submissions GySgt Pettiford made after the Marine Corps' final advisory opinion ...............15

    B. It fails to compare GySgt Pettiford's record with other Marines' service records that he submitted .............................................................18

    C. The Administrative Record does not confirm that the Marine Corps actually compared GySgt Pettiford's record with those of persons against whom he competed for promotion at each of the ERSBs that was supposed to have considered him for remedial promotion.........21

    D. The Marine Corps did not make the changes necessary to reflect the fact that GySgt Pettiford's record changed between the various regular promotion boards the ERSB was supposed to replicate ...............23

II.    THE CASE SHOULD BE REMANDED WITH INSTRUCTIONS
       TO CAUSE GYSGT PETTIFORD'S RECORD TO BE
       RECONSIDERED BY THE ERSB AND, IF HE IS NOT SELECTED,
       BY THE BCNR, IN EACH INSTANCE WITHOUT THE
       ERRORS NOTED IN POINT I....................................................................27

Conclusion ....................................................................................................28

Exhibits Omitted from Administrative Record

Letter from HQMC to Counsel, July 11, 2003

OMPFs Released by HQMC

Table of Citations

*Page*

Cases:

*Alabama v. Bozeman*, 533 U.S. 146 (2001) ................................................................ 26
*AT&T Corp. v. FCC*, 86 F.3d 242 (D.C. Cir. 1996) .................................................. 15
*Caddington v. United States*, 147 Ct. Cl. 629, 178 F. Supp. 604 (1959) ...................... 2
*Chappell v. Wallace*, 462 U.S. 296 (1983) ......................................................... 14, 15
*Detroit Newspaper Agency v. NLRB*, No. 04-1366 (D.C. Cir. Jan. 20, 2006) ............ 27
*Duhon v. United States*, 461 F.2d 1278 (Ct. Cl. 1972) .................................................. 2
*Engels v. United States*, 678 F.2d 173 (Ct. Cl. 1982) ................................................. 26
*Frizelle v. Slater,* 111 F.3d 172 (D.C. Cir. 1997) ................................... 14, 15, 26, 28
*Homer v. Roche*, 226 F. Supp. 2d 222 (D.D.C. 2002) ......................................... 20, 28
*Kalista v. Secretary of the Navy*, 560 F. Supp. 608 (D. Colo. 1983)........................... 16
*Kreis v. Sec'y of the Air Force*, 866 F.2d 1508 (D.C. Cir. 1989).................................. 14
*Miller v. Roche*, 2004 WL 3257070 (D.D.C. 2004)...................................................... 20
*Mozur v. Orr*, 600 F. Supp. 772 (E.D. Pa. 1985) ...................................................... 16
*Oleson v. United States*, 172 Ct. Cl. 9 (1965) ........................................................... 16
*Piersall v. Winter*, 2006 WL 196436 (D.C. Cir. 2006) ............................................. 14
*Raytheon Co. v. NLRB*, 326 F.2d 471 (1st Cir. 1964)................................................. 26
*Smith v. Dalton*, 927 F. Supp. 1 (D.D.C. 1996) ........................................................ 16
*State of Iowa v. FCC*, 218 F.3d 756 (D.C. Cir. 2000) ............................................... 15
*Synergy Gas Corp. v. NLRB*, 19 F.3d 649 (D.C. Cir. 1994)........................................ 16
*Thomas v. Chaney*, 925 F.2d 1407 (Fed. Cir. 1991).................................................... 2
*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .............................................. 15

Constitution and Statutes:

U.S. Const. art. III.......................................................................................................... 3
Freedom of Information Act, 5 U.S.C. § 552 (2000) ........................................ 9, 19, 23
Administrative Procedure Act, 5 U.S.C. § 706 (2000) ..................................... 1, 14, 27
10 U.S.C. § 628 (2000)................................................................................................... 1
Uniform Code of Military Justice, art. 15, 10 U.S.C. § 815 (2000) .............................. 6
10 U.S.C. § 1552 (2000).................................................................................... 5, 19, 20

Regulations:

32 C.F.R. Pt. 723 (2005)................................................................................................ 5
32 C.F.R. § 723.2(b) (2005).......................................................................................... 19
32 C.F.R. § 723.3(e)(2) (2005) ..................................................................................... 23
32 C.F.R. § 723.6(a)(2) (2005) ............................................................................... 22, 25
32 C.F.R. § 723.6(c)(2005) ............................................................................................ 3

32 C.F.R. § 723.8(b)(2) (2005) ..............................................................3
Marine Corps Order 5420.16C .............................................................10

Miscellaneous:

Fed. R. App. P. 30(d) ..............................................................................2
A.P. HERBERT, UNCOMMON LAW (1935)................................................26
DAVID A. SCHLUETER, MILITARY CRIMINAL JUSTICE:
     PRACTICE AND PROCEDURE (6th ed. 2004)..................................................6

## Glossary

| | |
|---|---|
| APA | Administrative Procedure Act |
| A.R. | Administrative Record |
| AZ | Above [Promotion] Zone |
| BCNR | Board for Correction of Naval Records |
| CMC | Commandant of the Marine Corps |
| CY | Calendar Year |
| ERSB | Enlisted Remedial Selection Board |
| FOIA | Freedom of Information Act |
| FY | Fiscal Year |
| GySgt | Gunnery Sergeant |
| HQMC | Headquarters, U.S. Marine Corps |
| IZ | In [Promotion] Zone |
| Maj | Major |
| MCO | Marine Corps Order |
| NCO | Noncommissioned officer |
| MSgt | Master Sergeant |
| OJAG | Office of the Judge Advocate General of the Navy |
| OMPF | Official Military Personnel File |
| SECNAV | Secretary of the Navy |
| SSB | Special Selection Board |
| SSgt | Staff Sergeant |

v

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAURICE B. PETTIFORD, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil No. 05-2082 (ESH) |
| | ) | |
| SECRETARY OF THE NAVY, | ) | |
| | ) | |
| *Defendant.* | ) | Judge Huvelle |

STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT
OF CROSS-MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO MOTION TO DISMISS

*Introduction*

This case brings on for Administrative Procedure Act, 5 U.S.C. § 706 ("APA"), review a decision of the Board for Correction of Naval Records ("BCNR"). The BCNR refused to grant relief with respect to a decision by the U.S. Marine Corps' Enlisted Remedial Selection Board ("ERSB").[1] The ERSB—which performs for enlisted Marines a role comparable to that played for officers by Special Selection Boards ("SSBs") under 10 U.S.C. § 628 (2000)—had refused to promote the plaintiff, a now-retired Gunnery[2] Sergeant. The BCNR decision falls far short of the standards prescribed by the APA and the military correction boards' "abiding moral sanction to determine, insofar as possible, the true nature of an alleged injustice and to take steps

---

[1] The ERSB was previously known as the Enlisted Remedial Promotion Board. *E.g.*, A.R. 227. We use the current term in this brief.

[2] In Marine Corps usage, the middle syllable in "Gunnery" is elided, so the word is pronounced "gunny" (rhymes with "sunny").

to grant thorough and fitting relief." *E.g., Duhon v. United States*, 461 F.2d 1278, 1281 (Ct. Cl. 1972), quoting *Caddington v. United States*, 147 Ct. Cl. 629, 178 F. Supp. 604, 607 (1959); *see also Thomas v. Chaney*, 925 F.2d 1407, 1423-24 (Fed. Cir. 1991).

At issue is a remand so the ERSB and, if need be, the BCNR and the Secretary can do their jobs in the proper manner.

*Administrative Record*

The Administrative Record the Secretary filed in CD-ROM form is incomplete (it does not include, *inter alia*, the attachments to GySgt Pettiford's final submission to the BCNR), lacks an index, is not in chronological order, and contains multiple copies of the same documents.[3] We have asked opposing counsel to file a Supplemental Administrative Record with the omitted materials.[4] The following table identifies the main documents for the Court's convenience. Those in **bold** type are the most pertinent to the issues presented in the litigation.

| Document | A.R. Page |
|---|---|
| 1st BCNR Application, Mar. 31, 1994 | 320 |
| 1st BCNR Decision, Dec. 12, 1995 (approved Apr. 11, 1996) | 251 |

---

[3] These shortcomings, which needlessly add to the time and effort required for briefing (and, presumably, adjudication) of the case, are not unique. The Court may wish to ask the Rules Advisory Committee to consider whether the Local Civil Rules should be amended to require that A.R.s contain a table of contents, be in chronological order, and omit duplicates. *Cf.* Fed. R. App. P. 30(d).

[4] The BCNR claims to have considered GySgt Pettiford's naval record, A.R. 2, but it is not included in the A.R. We have not asked opposing counsel to include it in the Supplemental Administrative Record but have no objection to the Court's requiring its submission.

Request for Enlisted Remedial Promotion Board, May 1, 1996...................................316

Letter from HQMC to GySgt Pettiford, June 27, 1996.................................................300

2d BCNR Application, Aug. 21, 1996.........................................................................301

BCNR Brief, Aug. 21, 1996.......................................................................................305

Advisory Opinion,[5] Dec. 9, 1996...............................................................................291

Letter from BCNR to GySgt Pettiford, Dec. 16, 1996.................................................295

Letter from Counsel [Kevin J. Barry] to BCNR, Jan. 8, 1997.......................................297

2d BCNR Decision, Mar. 18, 1997.............................................................................280

Fred Carr, Public Affairs, HQMC, *Remedial Promotion Boards Provide Another Opportunity*, June 13, 1997 ..........................................................191

Letter from Counsel [Eugene R. Fidell] to HQMC, Mar. 28, 2001..............................284

3d BCNR Application, Apr. 6, 2001 ...........................................................................266

**Letter from Counsel to BCNR, Apr. 16, 2001............................................ 267**

Advisory Opinion, May 10, 2001 ...............................................................................111

Letter from HQMC to Counsel, May 14, 2001............................................................243

Letter from HQMC to BCNR, May 24, 2001 ..............................................................112

**Letter from Counsel to BCNR, May 25, 2001............................................ 186**

Letter from BCNR to Counsel, May 30, 2001.............................................................260

Letter from GySgt Pettiford to CMC, July 2, 2001 .....................................................110

1st Endorsement on Letter from GySgt Pettiford to CMC, July 6, 2001.....................109

---

[5] In BCNR practice, an advisory opinion, *see* 32 C.F.R. §§ 723.6(c), 723.8(b)(2) (2005), is merely a submission from the uniformed arm of the service to the civilian correction board. Advisory opinions are not binding on the BCNR. The term has none of the connotations of advisory opinions in Article III jurisprudence.

ERSB Precept, Nov. 15, 2001 ...................................................................329

ERSB Report, Nov. 16, 2001...................................................................332

**Letter from Counsel to BCNR, Nov. 23, 2001** .......................................**6**

**Letter from Counsel to HQMC, Nov. 23, 2001**......................................**98**

**Advisory Opinion, Jan. 16, 2002** ...........................................................**17**

Letter from HQMC to Counsel, Jan. 29, 2002.........................................85

Letter from Counsel to BCNR, Jan. 31, 2002..........................................96

Letter from Counsel to HQMC, Feb. 5, 2002...........................................86

Letter from HQMC, Feb. 28, 2002...........................................................76

Letter from Counsel to OJAG, Mar. 8, 2002............................................89

**Letter from Counsel to BCNR, Mar. 27, 2002** ......................................**10**

Letter from Counsel to BCNR, June 10, 2002..........................................77

Letter from OJAG to Counsel, June 12, 2002 ..........................................35

**Letter from Counsel to HQMC, June 19, 2002** .....................................**45**

**Advisory Opinion, June 20, 2002**...........................................................**19**

Letter from HQMC to Counsel, July 1, 2002............................................37

Letter from Counsel to BCNR, July 11, 2002...........................................61

**Letter from HQMC to Counsel, Aug. 19, 2002**......................................**42**

**Letter from Counsel to CMC, Aug. 28, 2002** ........................................**40**

**Letter from HQMC to Counsel, Sept. 26, 2002**.....................................**32**

**Advisory Opinion, Oct. 16, 2002**............................................................**23**

**Letter from Counsel to BCNR, Oct. 29, 2002** .......................................**14**

Letter from Counsel to OJAG, July 3, 2003 ...................................................33

**Letter from HQMC to Counsel, July 11, 2003........................... Omitted from A.R.**

Letter from Counsel to HQMC, Aug. 25, 2003 .............................................31

Letter from Counsel to HQMC, Sept. 25, 2003 ............................................30

**Letter from Counsel to BCNR, Dec. 29, 2003
(Tabs 1-10 were OMPFs omitted from A.R.)...................................................... 24**

**3d BCNR Decision, May 7, 2004..............................................................................2**

The OMPFs and July 11, 2003 HQMC letter that were enclosed with counsel's December 29, 2003 submission to the BCNR are submitted herewith. The BCNR claims to have considered the enclosures to that submission, among others. A.R. 2.

### *Governing Statute and Regulations*

The governing statute is 10 U.S.C. § 1552. Under it, defendant is responsible for the correction of Navy and Marine Corps records, acting through a board of civilians known as the BCNR. The governing regulations are the published rules of the BCNR, which are found at 32 C.F.R. Pt. 723 (2005). Other agency regulations, issued by the Marine Corps, are reproduced in the Secretary's motion.

### *Question Presented*

IS THE BCNR'S DECISION ARBITRARY AND CAPRICIOUS, UNSUPPORTED BY SUBSTANTIAL EVIDENCE, AND CONTRARY TO LAW?

### *Statement of Facts*

As in the other armed forces, Marines may be officers or enlisted. There are 10 enlisted pay grades, E-1 through E-10. At issue in this case are pay grades E-6 (Staff

Sergeant), E-7 (Gunnery Sergeant), E-8 (Master Sergeant), and E-9 (Sergeant Major). All of these qualify as "staff noncommissioned officers" or "staff NCOs."

In 1994, GySgt Pettiford—a Staff Sergeant at the time—applied to the BCNR for removal of an unjust record of "office hours" or nonjudicial punishment.[6] A.R. 320.[7] The BCNR recommended a grant of relief in 1995, and this was approved by the Secretary's delegate in 1996. A.R. 251-57, 273-79, 322-28.

GySgt Pettiford's record was considered by the ERSB, A.R. 316, but he was still not advanced to GySgt. A.R. 249, 300, 303. Nonetheless, he was promoted to GySgt on July 1, 1996, having been selected by the regular selection board. A.R. 304.

Later in 1996, GySgt Pettiford reapplied to the BCNR when he learned that his record had not been correctly constituted when he came up for promotion to GySgt in 1993, 1994 and 1995. A.R. 301, 303-13. He asked to have his date of rank as an E-7 made retroactive on the basis that he should have been selected earlier. A.R. 308, 313. The BCNR denied the request on the basis that the ERSB had considered his record and refused remedial promotion even though the office hours document had been removed from his record. A.R. 280, 290-91.

---

[6] Nonjudicial punishment is provided for in Article 15 of the Uniform Code of Military Justice, 10 U.S.C. § 815 (2000), and is used as an alternative to court-martial for minor offenses. It is also known as "captain's mast" in the Navy and Coast Guard. *See generally* DAVID A. SCHLUETER, MILITARY CRIMINAL JUSTICE: PRACTICE AND PROCEDURE § 3-1, at 147 (6th ed. 2004).

[7] As noted above, the Administrative Record includes multiple copies of many documents. We have not attempted to include references in this brief to each place a particular document appears in the A.R.

In 2001, GySgt Pettiford was considered for promotion to Master Sergeant. A.R. 268. He learned that, contrary to prior representations to him, the office hours document that had been ordered removed from his record was still there, years later, in electronic form—where it was accessible to selection board members. A.R. 268-69, 282. He was not selected for promotion by the 2001 Master Sergeant selection board. A.R. 269.

Based on the disclosure, GySgt Pettiford returned to the BCNR, and suggested that the BCNR's 1997 denial of relief was based on an incomplete or inaccurate advisory opinion from the Marine Corps, and that the decision should have been to grant the relief he had sought. He asked that, rather than requiring further resort to the ERSB or other internal Marine Corps remedies, the BCNR should simply grant make-whole relief itself, correcting his date of rank as a GySgt to July 1, 1993, with consequent promotion to Master Sergeant effective July 1, 1998, the fifth anniversary of the date on which he should have been promoted to GySgt in the first place. A.R. 266-70.

The Marine Corps thereupon advised that it had removed the office hours record from GySgt Pettiford's file, A.R. 189, and that he could request remedial consideration for all selection boards that may have been affected by it. A.R. 260-61.

On July 2, 2001, GySgt Pettiford requested ERSB consideration, A.R. 157, and on July 6, 2001, his commanding officer favorably endorsed his request, stating: "Approval of this will correct an unfortunate injustice. GySgt Pettiford is fully qualified to be a Master Sergeant of Marines." A.R. 156; *see also* A.R. 160, 161, 163,

165, 283.

In September 2001, the ERSB agreed that GySgt Pettiford's promotion to GySgt should be made retroactive to November 1, 1994. A.R. 7. Thereafter, he applied to the BCNR for back pay, since the period of retroactivity exceeded that for which the Marine Corps can give back pay on its own. A.R. 7. The BCNR granted that request in November 2001. A.R. 7.

The ERSB did not rule, at first, on GySgt Pettiford's request for remedial promotion to Master Sergeant at the regular 1999, 2000 and 2001 selection boards. It finally did so on or about November 16, 2001, when it decided he should *not* be remedially promoted to Master Sergeant. A.R. 7, 19, 32, 338.

On November 23, 2001, having exhausted all of his remedies within the Marine Corps, GySgt Pettiford renewed his request for such relief from the BCNR. A.R. 6. His letter to the BCNR stated in pertinent part:

> There are two basic reasons the BCNR should grant remedial promotion to MSgt. *First*, the ERSB's proceedings were procedurally defective. *Second*, even if its procedures were valid, the result was arbitrary and capricious. We address each of these in turn.

1

**The ERSB's Decision was Procedurally Flawed**

> The ERSB failed to follow the required procedures. As explained in my May 25, 2001 letter [A.R. 186], including the enclosures, the Marine Corps does not conduct ERSBs in the proper, required manner. It does not in fact compare the records of Marines who are being considered for remedial promotion with records of those Marines with whom they would have competed before the regular selection boards. For example, when conducting a remedial review of the regular 1999 MSgt selection board, the ERSB should have reconstituted GySgt Pettiford's record to show his corrected GySgt date of rank (as per its September 2001

8

decision), and by removing any documents that did not exist as part of his record as of the date the regular 1999 MSgt board convened. Similarly, it had a duty to compare that record with the records of other GySgts with whom GySgt Pettiford would have competed before the regular 1999 MSgt board. And those records in turn would have had to be reconstituted to remove any documents that did not exist as part of the concerned Marines' records on the date they met the regular 1999 MSgt board. The process would then have to be repeated, if he was not selected for 1999 remedial promotion, with appropriate reconstitution of GySgt Pettiford's record and those of a sample of Marines who in fact were considered by the regular 2000 and 2001 MSgt boards.

The documents furnished to us by the Marine Corps indicate that the Corps does not conduct ERSBs in this fashion. We have, for your information, addressed a further FOIA request to Headquarters, U.S. Marine Corps, in this regard, but we have done so only out of an abundance of caution, since there is no indication that the Corps altered the process followed by the ERSB between the time of our earlier FOIA request [see A.R. 243] and the time the ERSB considered GySgt Pettiford's latest request. As additional documentation is received from the Marine Corps, we will forward it to you. A copy of our latest FOIA request [A.R. 104] is enclosed for your convenience.

There is no evidence that GySgt Pettiford's record was considered separately as to each of the three regular MSgt promotion boards with respect to which remedial consideration was required. This represents an error in itself, but the error is compounded by the fact that his record changed between the time of the 1999, 2000 and 2001 regular MSgt boards. There is no reason to believe that the ERSB had his record reconstituted to the condition it would have been in, separately, for each of those years. Among other things, additional fitness reports and a graduate certificate for telecommunications would have been added at various time[s] over the course of those years.

For these reasons and those previously stated, the ERSB's consideration of GySgt Pettiford for remedial promotion to MSgt must be voided.

2

### The ERSB's Decision was Arbitrary and Capricious

In any event, the BCNR has the power and duty to review the merits of ERSB decisions. Here, the ERSB's decision is arbitrary and

capricious in light of (a) this Marine's overall record (including two meritorious promotions, one to SSgt while on recruiting duty); (b) his earned B.S. degree while on active duty (an infrequent achievement for an enlisted Marine); (c) his progress toward an earned Master's degree (an even rarer achievement); and (d) the Commandant's repeated instruction to selection boards concerning the presumption that those who have completed a tour in recruiting are highly qualified (GySgt Pettiford has had two tours as a recruiter). [*E.g.*, A.R. 213 (¶ 8a), 222 (¶ 9a)]

Certainly nothing in GySgt Pettiford's record, as corrected, precluded his selection for MSgt, and while of course there was competition for promotion in 1999, 2000 and 2001, it was not so extraordinary as to render him noncompetitive. For example, according to the enclosed data for FY01, the selection rate was 62.8%. [A.R. 141, 172] Particularly since, under MCO 5420.16C, "the ERSB is not constrained by the selection allocations in effect as the time of the regularly scheduled board," [A.R. 149, 184] it is disturbing, giving the regular boards' actual selection rates, that the November 2001 ERSB selected none of the four [*sic*; should read "three"; *see* A.R. 12 (¶ 5)] GySgt's seeking remedial promotion to MSgt or 1stSgt. [A.R. 336-37]

Accordingly, the BCNR should now direct that GySgt Pettiford be promoted to Master Sergeant retroactive to MSgt effective November 1, 1998, since that is the date we believe he would have been promoted given his newly-established November 1, 1994 date of rank as a Gunnery Sergeant.

A.R. 7-9 (A.R. citations in brackets added).

The case took several more years for the BCNR to resolve, largely because it had to be placed in suspense, A.R. 24, 96, 102, while GySgt Pettiford struggled to extract pertinent documents and straight answers from the Marine Corps. A.R. 30-31, 33, 49-51, 54-58, 61-62, 73, 85-90. On June 1, 2002, GySgt Pettiford was transferred to the Fleet Marine Corps Reserve. A.R. 77-78.

In an October 16, 2002 advisory opinion to the BCNR, the Marine Corps claimed that it had compared GySgt Pettiford's record with those of other Marines

within his military occupational specialty who were considered by the original
Sergeant Major through Master Sergeant selection boards in 1999, 2000 and 2001.
It asserted that "[t]his is accomplished by the use of comparison records maintained
on file for each board held per calendar year." A.R. 23. By letter dated September
26, 2002, however, the Marine Corps had advised him that comparisons were made
as to only two of the three annual cycles at issue in the case (2000 and 2001). A.R.
32.

On December 29, 2003, in a final submission to the BCNR, GySgt Pettiford
filed the 10 comparison service records he had succeeded in prying out of the
Marine Corps as those which the ERSB allegedly considered. A.R. 24.[8] His
submission stated in pertinent part:

> On October 29, 2002 I wrote to you [A.R. 14] in response to the
> Marine Corps' October 16, 2002 memorandum in GySgt Pettiford's case.
> [A.R. 23] Since that time we have continued to press the Marine Corps
> for the information we have been seeking for so very long. [A.R. 30-31,
> 33] It now appears that we have received everything we are likely to
> get—unless the BCNR directs the Marine Corps to make a further
> submission. I therefore request that you terminate the suspension of
> these proceedings.

> On July 16, 2003, the Marine Corps released to us five sanitized
> OMPFs against which GySgt Pettiford's record was apparently compared
> by the Enlisted Remedial Separation Board ("ERSB"). Months later, five
> additional sanitized OMPFs [Official Military Personnel Files] were
> released to us in digital form. Copies of these 10 records are enclosed. We
> have the following comments:

> 1. It remains unknown how the Marine Corps actually conducted

---

[8] Defendant neglected to include those documents in the Administrative Record. *See*
pp. 2, 5 *supra*. We have asked that a Supplemental Administrative Record be
promptly filed and served.

the ERSB proceedings. As explained in my October 29, 2002 letter to you [A.R. 14], a September 26, 2002 letter from Major J.A. Popielec, Head, Enlisted Promotion Section, asserts that comparisons were made as to only two of the three annual cycles that are at issue in this case (CY 2000 and CY 2001). [A.R. 32] On the other hand, his October 16, 2002 memorandum to the BCNR [A.R. 23] appears to claim that comparisons were performed by the ERSB in respect of all three regular boards, *i.e.*, CY 1999-2001, as opposed to the two boards as to which he made such a claim three weeks earlier. This inconsistency remains unexplained.[9]

2. Maj Popielec's October 16, 2002 memorandum also claims that comparisons are "accomplished by the use of comparison records maintained on file for each board held per calendar year." It follows that there would be no problem retrieving the comparison records on a per-calendar-year basis. But only 10 OMPFs were furnished to us. The clear implication is that they were the only comparison records the 2001 ERSB relied on. If so, then either (a) Maj Popielec's description of the Marine Corps' comparison-record maintenance practices is inaccurate, or (b) the ERSB took a short cut and made multiple-year comparisons against a single set of records, or (c) the Marine Corps failed to furnish us all of the comparison records that were actually used. The records furnished to us do not distinguish between the various regular selection boards the ERSB was supposed to replicate using a corrected OMPF for GySgt Pettiford.

3. The conclusion is inescapable that the ERSB did not, in fact, replicate the various regular boards separately, as it was required to, but instead—at best—performed a single review covering a number of years and pay grades. This corner-cutting may have saved time, but it means—fatally—that neither GySgt Pettiford's OMPF nor those with which the Marine Corps claims to have compared it were adjusted to take account of the changes that would have had to be made with the passage of time between the CY 1999 regular board, the CY 2000 regular board, and the CY 2001 regular board. See my letter of Mar. 27, 2002, at 3 (¶ 4). The June 20, 2002 advisory opinion claims (at 3 (¶ 4g)) that we are merely speculating in this regard. [A.R. 19] There are two answers to this assertion: the actual practice followed by the ERSB staff is a matter peculiarly within the Marine Corps' knowledge, and nothing has

---

[9] In fact, GySgt Pettiford was supposed to be considered for remedial promotion in respect of *six* regular promotion boards—1999 IZ [In Zone] 1st Sgt and MSgt, 2000 IZ 1st Sgt, 2000 AZ [Above Zone] MSgt, 2001 IZ 1st Sgt, and 2001 AZ MSgt. [Footnote in original; bracketed explanations added.]

prevented the Marine Corps from refuting the point directly if the facts were other than as we have inferred. Second, nothing in the 10 sanitized OMPFs furnished to us gives the slightest reason to believe any such adjustments were made. The corner-cutting referred to above also means that GySgt Pettiford's record was not compared with a proper sample of those against whom he actually competed before the original boards, in light of the fact that the pool of staff NCOs actually considered for promotion obviously changes from, year to year.

4. Finally, and even if the BCNR could disregard all of the foregoing defects, the 10 sanitized OMPFs provide no rational basis on which to conclude that GySgt Pettiford would have been found in the do-not-promote category for each and every one of the promotion cycles the ERSB was supposed to replicate based on his corrected OMPF. They are not identified in any way that would permit a reader to determine which of the 10 were selected (and by which regular board for which pay grade) and which were not selected. Are the 10 records really applicable to all six of the regular boards the ERSB was required to replicate? If so, how many of those 10 Marines were selected, and for which grade in which year? If any of them were selected, that would mean they would not have been considered for the next annual cycle? See my letter of Mar. 27, 2002, at 3 n.2. [A.R. 12 n.2] Were no others substituted? In any event, the Marine Corps has not drawn our attention to anything that would justify the decision of the ERSB, and the achievements of GySgt Pettiford make his failures of selection by the ERSB for each and every one of the six affected promotion cycles, one after another, profoundly improbable. We encourage the BCNR to secure *complete* copies of his OMPF and those against which he was in fact compared by the ERSB (with indication as to who was selected and who was not, and by which regular board) to see if it can determine any better than we can whether there is in fact a substantial basis for the ERSB's decision.

On May 6, 2004, the BCNR voted to deny GySgt Pettiford's application. A.R. 1, 4. In a brief letter decision sent the following day, the BCNR stated that it "substantially concurred with the comments contained in the advisory opinions." A.R. 2. The advisory opinions referred to by the BCNR did not address matter that was submitted on GySgt Pettiford's behalf after they were written. *Compare* A.R. 17 (Jan. 16, 2002), 19 (June 20, 2002), 23 (Oct. 16, 2002) (advisory opinions) *with* A.R.

14 (Oct. 29, 2002), 24 (Dec. 29, 2003) (GySgt Pettiford's subsequent submissions).

The BCNR gave no indication of how it viewed GySgt Pettiford's responses to the advisory opinions or why it was not accepting his arguments. A.R. 2. It also gave no indication that it had compared GySgt Pettiford's record with any of the service records he had submitted, after having obtained them from the Marine Corps, much less that it had found him less qualified than others against whom he had allegedly been compared by the ERSB. A.R. 2.

### Standard of Review

The Court reviews BCNR decisions "in light of familiar principles of administrative law." *Piersall v. Winter*, No. 04-5382 (D.C. Cir. 2006), slip op. at 5, quoting *Kreis v. Sec'y of the Air Force*, 866 F.2d 1508, 1511 (D.C. Cir. 1989). These include the usual APA requirements that agency decisions not be arbitrary and capricious or contrary to law, and that they be supported by substantial evidence. *Chappell v. Wallace*, 462 U.S. 296, 303-04 (1983); *see also, e.g., Frizelle v. Slater*, 111 F.3d 172, 176 (D.C. Cir. 1997).

*Argument*

I

THE BCNR'S DECISION IS ARBITRARY AND CAPRICIOUS,
UNSUPPORTED BY SUBSTANTIAL EVIDENCE, AND
CONTRARY TO LAW

A

***It fails to explain how it was dealing with submissions
GySgt Pettiford made after the Marine Corps' final advisory opinion***

The Secretary concedes (at 12) that the BCNR had a duty to address GySgt Pettiford's non-frivolous arguments, *see Frizelle, supra,* at 177, but maintains (at 12-14) that the contentions in the two submissions GySgt Pettiford made to the BCNR after the Marine Corps' last advisory opinion had already been addressed.[10] Despite the chaotic state of the Administrative Record, it is not difficult to refute this contention.

*Frizelle*'s requirement for a remand where there are unaddressed non-frivolous *arguments* is neither unique[11] nor the end of the matter. An agency may also not disregard *evidence.* This is particularly pertinent because, under *Chappell,* decisions of the BCNR are subject to review for substantial evidence, and under *Universal Camera,* "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S.

---

[10] The Marine Corps' last advisory opinion was sent on October 16, 2002. A.R. 23. GySgt Pettiford made two detailed submissions thereafter, on October 29, 2002 and December 29, 2003. A.R. 14, 24.

[11] *See also, e.g., State of Iowa v. FCC*, 218 F.3d 756, 759 (D.C. Cir. 2000) (citing *Frizelle* and *AT&T Corp. v. FCC*, 86 F.3d 242, 247 (D.C. Cir. 1996)).

474, 488 (1951); *see also, e.g., Synergy Gas Corp. v. NLRB*, 19 F.3d 649, 651 (D.C. Cir. 1994).

An agency must consider all proffered evidence. Information arising after the other side's last word is classically a basis for a remand. *E.g., Smith v. Dalton*, 927 F. Supp. 1 (D.D.C. 1996); *Mozur v. Orr*, 600 F. Spp. 772, 776 (E.D. Pa. 1985). Here, it was not until his last submission that GySgt Pettiford was in a position to submit even sanitized copies of other Marines' OMPFs. A.R. 24. There is no justification for the BCNR's failure to address this evidence, and since the advisory opinions all predated the submission of this evidence, A.R. 17, 19, 23, they could not have done so either. Indeed, the Secretary relies (at 13) on the June 20, 2002 advisory opinion's claim that GySgt Pettiford's attack on the ERSB's decision was speculative. A.R. 21. While that characterization was never accurate, submission of the 10 sanitized OMPFs rendered it utterly untenable.

There was no further advisory opinion; the BCNR never addressed the matter; and the Secretary failed to include the evidence in the Administrative Record. An agency—especially one administering a remedial statute that must be construed liberally, *Kalista v. Secretary of the Navy*, 560 F. Supp. 608, 611 (D. Colo. 1983); *Oleson v. United States*, 172 Ct. Cl. 9 (1965)—cannot make up its mind on a matter once and for all, regardless of the later submission of evidence.

By the same token, the 10 sanitized OMPFs we submitted long after the last advisory opinion were important evidence in support of GySgt Pettiford's contention that the ERSB had not conducted board-by-board/year-by-year comparisons and had

not updated either his OMPF or the ones against which his was judged. Again, the Administrative Record offers not a clue as to whether the BCNR thought this evidence was probative on that point, and if not, why not.

GySgt Pettiford's final submission pointed out that in fact, he "was supposed to be considered for remedial promotion in respect of *six* regular promotion boards," not three. A.R. 25 n.* (emphasis in original). No advisory opinion ever addresses this, and neither does the BCNR's decision.

The Secretary's attempt to overcome GySgt Pettiford's claim that he made arguments and submitted evidence that were nowhere responded to either by the BCNR or in the advisory opinions must be rejected. Because neither the BCNR's decision nor the advisory opinions it adopted, A.R. 2, ever addressed important parts of GySgt Pettiford's critical last two submissions, the decision must be set aside and the case remanded for the requisite explanation.[12]

---

[12] In a model of understatement, the Secretary observes (at 13) that "[u]ndoubtedly, it would have been clearer had the [October 16, 2002] advisory opinion or the BCNR explained that the nature of the records used for comparison had changed between 1999 and 2000." In fact, there was no such explanation and the two sources the Secretary cites—Def. Ex. 1 and A.R. 330—do not support his *post hoc* description. The Marine Corps and BCNR had years in which to identify any pertinent changes in the process, and neither ever did. *See generally* Pl. Statement of Genuine Issues ¶ 8; *see also id.* ¶¶ 11-13. The Secretary's contention (13) that the ERSB was not required to perform a comparison in connection with the 1999 board is directly refuted by a 1997 statement from HQMC. A.R. 191-92. That statement perforce describes administration of the ERSB under the 1995 version of the regulation.

B

### *It fails to compare GySgt Pettiford's record with other Marines' service records that he submitted*

"It is irrelevant to the BCNR's determination," the Secretary claims (at 14), "what sanitized records plaintiff submitted." The Secretary's four-pronged theory in support of this assertion is (a) that the original 1999 selection board that the ERSB had to replicate did not have a duty to compare OMPFs at all (14); (b) that selection board proceedings are not disclosable (14-15); (c) that there is no formula for promotion (15); and (d) that it is not the BCNR's function "to conduct[] a *de novo* comparison of Plaintiff's record with any other Marine's record" (16).

These assertions do not withstand scrutiny.

(a)  The Secretary's first point is addressed only to the 1999 board, and not to the 2000-01 boards, so at best it would relate to only a third of the case. But even as to the 1999 board, the Administrative Record demonstrates that comparison of OMPFs was required. What is more, the Marine Corps even claimed it had done so. A.R. 17. The Secretary's contention that all the ERSB had to do in respect of that board was compare GySgt Pettiford's OMPF with a "performance index" (a term never defined or explained below) is also refuted by a 1997 issuance from HQMC that nowhere mentions a "performance index." A.R. 191-92 (ERSB "weighs the Marine's overall performance up to the time the regular board had convened against the performance of those originally selected for promotion").[13]

_____

[13] Precisely what the ERSB did is harder to pin down from this Administrative

(b) Promotion board deliberations are subject to an oath of secrecy, but the records such a board considers are not in themselves secret. In any event, the Commandant of the Marine Corps (and a fortiori, the Secretary) has power to release the members from their oath of secrecy, *e.g.*, A.R. 197 (¶ 2), 200 (¶ 15), and although the BCNR (through which the Secretary acts, 10 U.S.C. § 1552) "is not an investigative body," 32 C.F.R. § 723.2(b) (2005), it does have the power to require the service to produce pertinent records, 32 C.F.R. § 723.6(a)(2) (2005), regardless of whether a member of the public such as GySgt Pettiford might have a cause of action to compel their release under the FOIA. We encouraged the BCNR to secure complete copies of the pertinent records. A.R. 26. So far as the Administrative Record reveals, it never did so.

(c) No one would argue that selection under a "best qualified" standard involves the rote application of a "numerical or arithmetic formula." That, however, is no answer to GySgt Pettiford's objection to the BCNR's failure to engage in *any* kind of comparative consideration or to require some explanation from the Marine Corps or

---

Record than it ought to be if APA review is to be meaningful. The precept refers to "the performance index," A.R. 330, without explaining what that is or how it is to be used, and goes on to state that for the 2000-01 boards, "the record will be compared to the record of the selected Marine who received the lowest number of votes among those who were selected in the same competitive category." *Id.* This describes head-to-head comparison against the record of a single Marine for each board. If that is so, the ERSB would have compared GySgt Pettiford's OMPF against only one OMPF for each regular board it was replicating. Yet 10 OMPFs were furnished to us in response to our request for the records the ERSB considered, A.R. 25, 340, and HQMC "verified that GySgt Pettiford was rated against 10 other Marines." Letter from Teresa D. Ross, HQMC, to Counsel, July 11, 2003 (copy submitted herewith). On this record, the ERSB's practice cannot be reconciled with the precept under which it was required to function.

19

ERSB as to *why* he was not given a remedial promotion in respect of any of the three years at issue.

(d) The Secretary's claim that it is not the BCNR's task to compare records disregards the sweep of the BCNR's authority as well as its high function as the body through which the Secretary acts when correcting records. In order to determine whether the ERSB's decision constituted an error or injustice (the two prongs of the BCNR's authority under 10 U.S.C. § 1552), the BCNR had two choices.

First, it could direct the ERSB to explain why it had not recommended GySgt Pettiford for promotion. It may be, as the Secretary notes (at 5), that the ERSB has no duty to explain its decisions. That, as this Court observed in an analogous setting involving an Air Force officer, "is its privilege, but in the absence of any explanation of how that selection board exercised its authority, the Court cannot find that [it] acted in a non-arbitrary fashion in declining to promote plaintiff or that the decision was based on substantial evidence." *Homer v. Roche*, 226 F. Supp. 2d 222, 226 (D.D.C. 2002); *see also Miller v. Roche*, 2004 WL 3257070 (D.D.C. 2004) (remanding for explanation of SSB decision).

Absent any explanation from the ERSB (something the BCNR never demanded), the BCNR had to perform its own review to determine whether an error or injustice had occurred. GySgt Pettiford had a right to meaningful civilian review, and the only way the BCNR can furnish that review where, as here, an applicant has no obvious disqualifying career blemishes such as a court-martial conviction, is to consider the matter from a comparative perspective. Such review is not *de novo*. It

would simply be a review—presumably a deferential one—of the comparative review the ERSB was supposed to have done.

The BCNR never performed even that limited review. Indeed, without exercising its rule-based power to require information from the Marine Corps, it disabled itself from doing so.

## C

### *The Administrative Record does not confirm that the Marine Corps actually compared GySgt Pettiford's record with those of persons against whom he competed for promotion at each of the ERSBs that was supposed to have considered him for remedial promotion*

The Secretary insists (at 16-17) that the ERSB had a duty to compare GySgt Pettiford's OMPF with those of other Marines only for replication of the 2000 and 2001 boards, and that for replication of the 1999 board, all that was required was use of a "performance index." He claims (at 17) that the Administrative Record "demonstrates that the ERSB followed the required procedures" and invokes the presumption of regularity.

The asserted distinction between the standards used for ERSB replication of the 1999 and those used for replication of the 2000-01 boards was never advanced by the BCNR or in any of the Marine Corps advisory opinions on which it rested its decision. Accordingly, this is a *post hoc* rationalization and the BCNR's decision cannot be sustained on this basis.

In any event, the point is of no merit. At all times, the ERSB was required to conduct a comparative process. Both versions of the governing regulation (1995 and

2000) required it to employ the same standards as were employed by the original selection boards. Those boards, in turn, were required to use the "best and fully qualified" standard—a standard that is inherently comparative. The 2001 ERSB was instructed to use the "fully qualified" standard rather than the usual standard, A.R. 331 (¶ 6), because the ERSB "is not subject to the limitations of promotion percentage or authorized selection numbers which are ordinarily applicable to regularly scheduled selection boards." A.R. 330 (¶ 5a); *see also* A.R. 20 (¶ 3d), 177 (¶ 1b.(4)). The process, however, remained comparative. A.R. 21 (¶ 3f), 177 (¶ 1b.(4)), 330 (¶ 5b).

The Secretary argues (at 17) that it was sufficient for the ERSB to use a "performance index" when replicating the original 1999 board. But the Marine Corps' January 16, 2002 advisory opinion makes no distinction between 1999, on the one hand, and 2000-01, on the other; it makes no reference to a "performance index," but rather claims that the ERSB used "comparison cases maintained on file for each board held per calendar year." A.R. 17 (¶ 2). The same is true of the October 16, 2002 advisory opinion. A.R. 23 (¶ 2). The contemporaneous report of the ERSB's 2001 proceedings in no way distinguishes between the replication of the 1999 board and the replication of the 2000-01 boards. A.R. 332-38. So far as can be determined from that report, the same process was used across-the-board.

Once again, the BCNR could have required the Marine Corps—which has a monopoly on the information—to clarify all this, 32 C.F.R. § 723.6(a)(2) (2005), but it never did so.

We respectfully submit that it pushes the presumption of regularity past the

22

breaking point to read into the ERSB's report of proceedings a distinction in treatment that is nowhere suggested on the face of the document—and that the Marine Corps never urged in any of its advisory opinions.

D

### The Marine Corps did not make the changes necessary to reflect the fact that GySgt Pettiford's record changed between the various regular promotion boards the ERSB was supposed to replicate

GySgt Pettiford's submissions to the BCNR were more than ample to raise a substantial issue as to whether the ERSB had modified his OMPF and whatever other OMPFs it considered in making the required comparative judgments as to whether he was among those "best qualified" for promotion.[14] The gist of this issue is that a Marine's OMPF changes periodically, as new matter is added (or, on occasion, as here, as old matter is removed). It is incumbent on the ERSB to ensure that when it sought to replicate, for example, the original 1999 selection board, GySgt Pettiford's record spoke as of the date of that original board, and that whatever other Marines' records his was compared with did as well. The regulations and instructions have always been clear that this was at the core of the ERSB process.

The Marine Corps' various advisory opinions and the documents GySgt Pettiford was able to secure under FOIA, 5 U.S.C. § 552 (2000), offer no assurance whatever that the ERSB saw to it that GySgt Pettiford's OMPF was tailored for each

---

[14] All that is required of an applicant is that he or she "demonstrate the existence of probable material error or injustice." 32 C.F.R. § 723.3(e)(2) (2005); *see also* A.R. 3, 280.

of the distinct reconsiderations to which he was entitled. Nor does the record furnish any basis for inferring that the records against which his was considered were similarly tailored on a board-by-board, year-by-year basis. Quite the reverse, the OMPFs we were furnished by the Marine Corps were in no way identified by board or year, and nothing in them indicates tailoring to ensure that they spoke (as required) as of the date of the applicable original selection board. The fact that we received 10 sanitized OMPFs, rather than more (given the number of original boards to be replicated), demonstrates that no such tailoring was performed. The Marine Corps also never released to us or submitted to the BCNR separate versions of GySgt Pettiford's OMPF, as would have been required if his OMPF had indeed been adjusted on a year-by-year/board-by-board basis.

In response, the Secretary argues (at 17-18) (a) that the BCNR found this aspect of GySgt Pettiford's case speculative; (b) that the Marine Corps was unable to release comparison records for privacy reasons; (c) that the presumption of regularity applied; and (d) that, far from being prejudiced if the records were not changed for each replicated board, GySgt was in fact afforded "an unfair advantage" over the Marines with whom he was competing.

Each of these contentions is mistaken, either legally or factually or both.

(a) The evidence submitted by GySgt Pettiford was by no means speculative. The Marine Corps submitted repeated advisory opinions. Not once did it state or even suggest that GySgt Pettiford's OMPF and the other OMPFs being used as benchmark records had been modified to take account of the closing date for each of the replicated

24

boards. Nor were there any indications in the 10 sanitized OMPFs we pried out of the Marine Corps that they had been adjusted to reflect separate closing dates. Even when this matter was squarely brought to the BCNR's attention, the service never came forward with the kind of straightforward factual representation the existing evidence demanded on this important point. The Secretary's motion papers do no better.

For all of these reasons, the claim that GySgt Pettiford's objection was "pure speculation" is wishful thinking. While we believe he is entitled to prevail on this basis alone, it is again worth recalling that the BCNR has an "abiding more sanction to determine, insofar as possible, the true nature of an alleged injustice," *see* pp. 1-2 *supra* (collecting cases), and the power to require "military authorities to provide such further information as it may consider essential to a complete and impartial determination of the facts and issues." 32 C.F.R. § 723.6(a)(2) (2005). From either perspective, the BCNR's decision is seriously deficient.

(b) Nothing prevented the BCNR from obtaining access to the comparison records. We never had any objection to sanitization; indeed, we sought it. A.R. 90, 340. Moreover, when the Marine Corps released five of the OMPFs to us, it actually noted which Marines' records they were in describing the enclosures. But whether or not GySgt Pettiford could see the comparison records, nothing prevented the BCNR from doing so as part of its "abiding moral sanction." It never did.

(c) The evidence adduced by GySgt Pettiford, both direct and circumstantial, was sufficient to overcome the presumption of regularity. Had the Marine Corps ever

stated in so many words that it adjusted the comparison records to ensure that they spoke as of each applicable end-date, the case might be different. Here, however, even the sanitized records available to us show that this was not done. Indeed, the fact that those records were not segregated by year strongly suggests that the Marine Corps did not do board-by-board remedial consideration, but rather, simply did one blanket reconsideration.

(d) The Secretary's last point is like the proverbial "thirteenth stroke of a crazy clock, which not only is itself discredited but casts a shade of doubt over all previous assertions." A.P. HERBERT, UNCOMMON LAW 28 (1935) (*Rex v. Haddock*); *e.g., Alabama v. Bozeman*, 533 U.S. 146, 155 (2001); *Raytheon Co. v. NLRB*, 326 F.2d 471, 476 (1st Cir. 1964). Under the cases, once an error is shown, the burden is on the agency to prove that the same adverse action would have occurred in any event. *E.g., Frizelle, supra*, 111 F.3d at 179; *Engels v. United States*, 678 F.2d 173, 175-77 (Ct. Cl. 1982).

If the Secretary believes, therefore, that GySgt Pettiford would not have been selected by the ERSB in respect of any of the boards it was supposed to replicate, it was incumbent on the government to prove it. But there is no such proof. Rather, all we can tell from the Administrative Record is that GySgt Pettiford was a much-admired and unusually well-educated staff NCO with a very fine record. *E.g.*, A.R. 130-33, 135. He had the important credential of service as a recruiter. A.R. 8, 198 (¶ 8a), 206 (¶ 8a), 213 (¶ 8a), 222 (¶ 9a) He was certainly not inevitable road-kill in the ERSB process—unless, of course, there was some lingering taint despite the BCNR's earlier efforts to correct his record.

The Secretary's hypothesis (18) that *if* the Marine Corps failed to keep the ERSB's effort separate on a year-by-year basis and to adjust OMPFs accordingly actually conferred an advantage on GySgt Pettiford suggests desperation. Nothing in the Administrative Record indicates whether the comparison OMPFs also included matter outside the time-frame of the original boards to be replicated. As a result, this argument suffers from precisely the kind of speculation which the Secretary imputes without foundation to GySgt Pettiford. It conveniently assumes that his OMPF was constructed more broadly than the others', or, in the alternative, that if the Marine Corps disregarded the time-frame requirement, only his OMPF showed improvement. Either way, it is an argument that cannot be accepted consistent with the rigor the APA demands of federal agencies.

The Secretary is perfectly entitled to argue in the alternative, but it certainly does not add to the credibility of his position—much less encourage judicial deference—when he proffers such an argument without *ever* flatly saying what the underlying facts were regarding the ERSB's actual practice. The omission, both below and again here, speaks volumes.

II

THE CASE SHOULD BE REMANDED WITH INSTRUCTIONS TO
CAUSE GYSGT PETTIFORD'S RECORD TO BE RECONSIDERED
BY THE ERSB AND, IF HE IS NOT SELECTED, BY THE BCNR,
IN EACH INSTANCE WITHOUT THE ERRORS NOTED IN POINT I

In keeping with settled principles of administrative law, *e.g., Detroit Newspaper Agency v. NLRB*, No. 04-1366 (D.C. Cir. Jan. 20, 2006) (2-1 decision) (remanding for

27

clarification); *Frizelle, supra; Homer, supra*. Sgt Pettiford seeks only a remand. He does not ask that the Court direct the Secretary to correct his record, but only that the matter be remanded with instructions to further remand to the ERSB. The ERSB should be required (a) to compare GySgt Pettiford's OMPF with those of the Marines against whom he must be compared under the ERSB regulation (conducting distinct proceedings in respect of each original selection board as to which he is entitled to remedial consideration); (b) to ensure that all changes necessary to reflect the fact that both his OMPF and those of the Marines against which the ERSB compares him necessarily changed from year to year; and (c) to preserve and segregate by year the records against which his OMPF is considered in respect of each remedial consideration so that the evidentiary difficulties that led to this litigation will not have to be confronted all over again. This will facilitate further review by the BCNR and the Secretary in the event the ERSB persists in not recommending GySgt Pettiford's promotion.

### Conclusion

For the foregoing reasons, the Secretary's Motion to Dismiss or, in the Alternative, for Summary Judgment should be denied and GySgt Pettiford's Cross-Motion for Summary Judgment should be granted. A judgment should issue—

a. setting aside the decisions of the ERSB and BCNR;

b. remanding the case with instructions to cause GySgt Pettiford's record to be reconsidered by the ERSB and, if he is not selected, by the BCNR, in each instance without the errors noted here, no later than 120 days after the date of judgment; and

c. granting such other and further relief as may in the circumstances be just and proper.

Respectfully submitted,

*Eugene Fidell*

Eugene R. Fidell (112003)
Matthew S. Freedus (475887)
Charlotte E. Cluverius (493655)
Feldesman Tucker Leifer Fidell LLP
2001 L Street, N.W., Second Floor
Washington, DC 20036
(202) 466-8960

*Attorneys for Plaintiff*

February 9, 2006

29