UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MAURICE B. PETTIFORD,                )
                                     )
                    *Plaintiff*,     )
                                     )
          v.                         )          Civil No. 05-2082 (ESH)
                                     )
SECRETARY OF THE NAVY,               )
                                     )
                    *Defendant*.     )          Judge Huvelle


STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF
RENEWED CROSS-MOTION FOR SUMMARY JUDGMENT AND
MOTION FOR LEAVE TO FILE SECOND AMENDED AND
SUPPLEMENTAL COMPLAINT AND IN OPPOSITION TO
MOTION TO DISMISS OR, IN THE ALTERNATIVE,
FOR SUMMARY JUDGMENT


Eugene R. Fidell (112003)
Matthew S. Freedus (475887)
Feldesman Tucker Leifer Fidell LLP
2001 L Street, N.W., Second Floor
Washington, DC 20036
(202) 466-8960

*Attorneys for Plaintiff*

March 31, 2008

Table of Contents

*Page*

Introduction ................................................................................................................ 1

Governing Statute and Regulations .......................................................................... 2

Questions Presented ................................................................................................... 3

       DOES THE COMPLAINT STATE A CLAIM ON WHICH RELIEF MAY BE GRANTED?

       DID THE ENLISTED REMEDIAL SELECTION BOARD HAVE THE REQUISITE NUMBER OF MEMBERS?

       IS THE BCNR'S DECISION ARBITRARY AND CAPRICIOUS, AN ABUSE OF DISCRETION, UNSUPPORTED BY SUBSTANTIAL EVIDENCE, OR CONTRARY TO LAW?

Statement of Facts ..................................................................................................... 4

Standard of Review .................................................................................................. 16

Argument ................................................................................................................. 16

I.     THE COMPLAINT STATES A CLAIM ON WHICH RELIEF MAY BE GRANTED .................................................................................................. 16

II.    THE ERSB PROCEEDINGS WERE INVALID BECAUSE THE ERSB LACKED THE REQUISITE NUMBER OF MEMBERS ............................... 18

III.   THE BCNR'S REFUSAL TO GRANT RELIEF WAS ARBITRARY AND CAPRICIOUS, AN ABUSE OF DISCRETION, UNSUPPORTED BY SUBSTANTIAL EVIDENCE, AND CONTRARY TO LAW ............................... 20

     A.  Navy Lititigation should not have been involved in the BCNR's proceedings on remand ...................................................................................... 20

     B.  GySgt Pettiford is entitled to relief as to the CY 1999 ERSB ..................... 22

     C.  GySgt Pettiford is entitled to relief as to the CY 2000 and 2001 ERSBs ......... 25

Conclusion ............................................................................................................... 29

Table of Citations

*Page*

Cases:

*Alford v. United States*, 3 Cl. Ct. 229 (1983)..................................................................18
*Amato v. Chafee*, 337 F. Supp. 1214 (D.D.C. 1972) .......................................................28
*Arens v. United States*, 24 Cl. Ct. 407 (1991), *rev'd on other grounds*,
   969 F.2d 1034 (Fed. Cir. 1992) .....................................................................................18
*Caddington v. United States*, 147 Ct. Cl. 629, 178 F. Supp. 604 (1959)...................2, 19
*Chappell v. Wallace*, 462 U.S. 296 (1983) ...............................................................16, 18
*Chicago Professional Sports Ltd. Partnership v. National Basketball Ass'n*,
   95 F.3d 593 (7th Cir. 1996) ...........................................................................................25
*Doggett v. United States*, 207 Ct. Cl. 478 (1975) ...........................................................18
*Duhon v. United States*, 461 F.2d 1278 (Ct. Cl. 1972)..............................................2, 19
*Dysart v. United States*, 369 F.3d 1303 (Fed. Cir. 2004) ...............................................17
*Engels v. United States*, 678 F.2d 173 (Ct. Cl. 1982).....................................................25
*Estate of Aitken v. Shalala*, 986 F. Supp. 57 (D. Mass. 1997).......................................26
*Frizelle v. Slater*, 111 F.3d 172 (D.C. Cir. 1997) ....................................................16, 17
*Hertzog v. United States*, 167 Ct. Cl. 377 (1964)...........................................................18
*Kreis v. Sec'y of the Air Force*, 866 F.2d 1508 (D.C. Cir. 1989) ..............................16, 18
*Laningham v. United States*, 5 Cl. Ct. 146 (1984)..........................................................17
*Monti v. United States*, 223 F.3d 76 (2d Cir. 2000)........................................................26
*Moore v. United States*, 5 Cl. Ct. 457 (1984) .................................................................17
*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)..........................................................................................................26
*Piersall v. Winter*, 435 F.3d 319 (D.C. Cir. 2006) .........................................................16
*Proper v. United States*, 154 F. Supp. 317 (Ct. Cl. 1957) ..............................................21
*Quinton v. United States*, 64 Fed. Cl. 118 (2006)...........................................................25
*Ridgely v. Marsh*, 866 F.2d 1528 (D.C. Cir. 1989) ........................................................25
*Schuenemeyer v. United States*, 4 Cl. Ct. 649 (1984)......................................................18
*Selman v. United States*, 498 F.2d 1354 (Ct. Cl. 1974) ..................................................18
*Skinner v. United States*, 594 F.2d 824 (Ct. Cl. 1979) ...................................................18
*Synergy Gas Corp. v. NLRB*, 19 F.3d 649 (D.C. Cir. 1994) ...........................................28
*Thomas v. Chaney*, 925 F.2d 1407 (Fed. Cir. 1991).................................................2, 19
*Tourus Records, Inc. v. Drug Enforcement Administration*,
   259 F.3d 731 (D.C. Cir. 2001).......................................................................................26
*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ................................................28
*Voge v. United States*, 11 Cl. Ct. 510 (1987), *aff'd in pertinent part*,
   844 F.2d 776 (Fed. Cir.) .................................................................................................17

Constitution and Statutes:

U.S. Const.:
   art. II, § 2..........................................................................................................................17

art. III ..................................................................................................................... 1
Freedom of Information Act, 5 U.S.C. § 552 ................................................... 5, 6
Administrative Procedure Act, 5 U.S.C. § 706 ........................ 1, 16, 17, 18, 26, 28
10 U.S.C. § 628 .................................................................................................... 2
Uniform Code of Military Justice, art. 15, 10 U.S.C. § 815 .............................. 3
10 U.S.C. § 1552 ........................................................................................ 2, 19, 21
10 U.S.C. § 1555 ............................................................................................... 21
10 U.S.C. § 1556 ............................................................................................... 20
10 U.S.C. § 6330 ................................................................................................. 7
10 U.S.C. § 6331 ................................................................................................. 7

Regulations:

32 C.F.R. Pt. 723 ................................................................................................. 2
32 C.F.R. § 723.6(c) ............................................................................................. 1
32 C.F.R. § 723.8(b)(2) ........................................................................................ 1
Marine Corps Order 5420.16A ......................................................................... 19
Marine Corps Order 5420.16B (1995) ............................................................. 19
Marine Corps Order 5420.16C (2000) ....................................................... 2, 4, 18

Miscellaneous:

DAVID A. SCHLUETER, MILITARY CRIMINAL JUSTICE:
    PRACTICE AND PROCEDURE (6th ed. 2004) ............................................... 3

# Glossary

AO ................................................................................................... Advisory Opinion
APA ..................................................................................... Administrative Procedure Act
A.R. ..................................................................................... Administrative Record
AZ .................................................................................. Above [Promotion] Zone
BCNR ............................................................. Board for Correction of Naval Records
CMC ............................................................... Commandant of the Marine Corps
CY ........................................................................................ Calendar Year
ERPB ......................................................... Enlisted Remedial Promotion Board
ERSB ......................................................... Enlisted Remedial Selection Board
FOIA ......................................................... Freedom of Information Act
FY ............................................................................................. Fiscal Year
GySgt ............................................................................... Gunnery Sergeant
HQMC ......................................................... Headquarters, U.S. Marine Corps
IZ ................................................................................ In [Promotion] Zone
JAG ................................................................... Judge Advocate General
Maj ............................................................................................... Major
MCO ................................................................... Marine Corps Order
MOS ............................................................. Military Occupational Specialty
MGySgt ......................................................... Master Gunnery Sergeant
MSgt ............................................................................ Master Sergeant
OJAG ........................................ Office of the Judge Advocate General of the Navy
OMPF ......................................................... Official Military Personnel File
SECNAV ............................................................. Secretary of the Navy
S ....................................................... Supplemental Administrative Record
SNCO ............................................................. Staff Noncommissioned Officer
SSB ................................................................... Special Selection Board
SSgt ............................................................................... Staff Sergeant

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MAURICE B. PETTIFORD,          )
                                    )
                 *Plaintiff*,     )
                                    )
       v.                    )     Civil No. 05-2082 (ESH)
                                    )
SECRETARY OF THE NAVY,     )
                                    )
             *Defendant*.    )     Judge Huvelle

STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF
RENEWED CROSS-MOTION FOR SUMMARY JUDGMENT AND
MOTION FOR LEAVE TO FILE SECOND AMENDED AND
SUPPLEMENTAL COMPLAINT AND OPPOSITION TO
MOTION TO DISMISS OR, IN THE ALTERNATIVE,
FOR SUMMARY JUDGMENT

*Introduction*

This case brings on for Administrative Procedure Act, 5 U.S.C. § 706 ("APA"), review a

July 16, 2007 decision of the Board for Correction of Naval Records ("BCNR"), following earlier

briefing and a voluntary remand. Dkt. 16. The Secretary sought that remand because the BCNR had

relied on a flawed advisory opinion[1] provided to it by the Marine Corps. S3, S14; [2] *see also* S15

("[h]e may win based on the erroneous explanation given to him"). On remand, the BCNR again

refused to grant relief with respect to a decision by the Marine Corps' Enlisted Remedial Selection

Board ("ERSB"). S3. The ERSB—which performs for enlisted Marines a role comparable to that

---

[1] In BCNR practice, an advisory opinion, *see* 32 C.F.R. §§ 723.6(c), 723.8(b)(2), is merely a submission from the uniformed arm of the service to the civilian correction board. Advisory opinions are not binding on the BCNR. The term has none of the connotations of advisory opinions in Article III jurisprudence.

[2] We cite the Supplemental Administrative Record as "S[page]."

played for officers by Special Selection Boards ("SSBs") under 10 U.S.C. § 628—acting without the requisite number of members, had refused to promote plaintiff, a now-retired Gunnery[3] Sergeant.

The BCNR's 2007 decision again falls far short of the standards prescribed by the APA and the BCNR's "abiding moral sanction to determine, insofar as possible, the true nature of an alleged injustice and to take steps to grant thorough and fitting relief." *E.g., Duhon v. United States*, 461 F.2d 1278, 1281 (Ct. Cl. 1972), quoting *Caddington v. United States*, 147 Ct. Cl. 629, 178 F. Supp. 604, 607 (1959); *see also Thomas v. Chaney*, 925 F.2d 1407, 1423-24 (Fed. Cir. 1991).

*Governing Statute and Regulations*

The governing statute is 10 U.S.C. § 1552. Under it, the Secretary, acting through a board of civilians, is responsible for the correction of Navy and Marine Corps records. The governing regulations are the BCNR's rules, 32 C.F.R. Pt. 723; Def. Ex. 3, and Marine Corps Order 5420.16C, Def. Ex. 2, which governs the ERSB.

*Questions Presented*

DOES THE COMPLAINT STATE A CLAIM ON WHICH RELIEF MAY BE GRANTED?

DID THE ERSB HAVE THE REQUISITE NUMBER OF MEMBERS?

IS THE BCNR'S DECISION ARBITRARY AND CAPRICIOUS, AN ABUSE OF DISCRETION, UNSUPPORTED BY SUBSTANTIAL EVIDENCE, OR CONTRARY TO LAW?

*Statement of Facts*

Plaintiff is a retired Gunnery Sergeant (pay grade E-7) ("GySgt") in the United States Marine Corps. A.R. 77. In 1994, GySgt Pettiford—a Staff Sergeant (pay grade E-6) at the time—

---

[3] In Marine Corps usage, the middle syllable in "Gunnery" is elided, so the word is pronounced "gunny" (rhymes with "sunny").

applied to the BCNR when he learned that his record had not been correctly constituted when he came up for promotion to GySgt in 1993, 1994 and 1995. It contained an unjust reference to non-judicial punishment, known in the Marine Corps as "office hours." [4] A.R. 303, 320. The BCNR granted relief and directed that the office hours document that caused his failures of selection to be removed from his record. A.R. 251-57, 273-79, 321, 322-28. Thereafter, his record was considered by the ERSB's predecessor body, the Enlisted Remedial Promotion Board ("ERPB"), A.R. 316, but he was still not advanced to GySgt. A.R. 249, 300, 303. Nonetheless, he was promoted to GySgt on July 1, 1996, having been selected by the regular selection board. A.R. 304.

GySgt Pettiford reapplied to the BCNR to have his date of rank as an E-7 made retroactive on the basis that he should have been selected earlier. A.R. 301, 308, 313. The BCNR denied the request on the basis that the ERPB had considered his record and refused remedial promotion even though the office hours document had been removed from his record. A.R. 280, 290-91.

In 2001, GySgt Pettiford was considered for regular promotion to Master Sergeant. A.R. 268. He learned that, contrary to prior representations to him, the office hours document that had been ordered removed from his record was still there, years later, in electronic form—where it was accessible to selection board members. A.R. 268-69, 282. He was not selected for promotion by the 2000 and 2001 Master Sergeant regular selection boards. A.R. 269; Def. Statement of Material Facts ¶ 10.

Based on the disclosure concerning the office hours, GySgt Pettiford returned to the BCNR, and suggested that its 1997 denial of relief, A.R. 280, was based on an incomplete or in-

---

[4] Nonjudicial punishment is provided for in Article 15 of the Uniform Code of Military Justice, 10 U.S.C. § 815, and is used as an alternative to court-martial for minor offenses. It is also known as "captain's mast" in the Navy and Coast Guard. *See generally* DAVID A. SCHLUETER, MILITARY CRIMINAL JUSTICE: PRACTICE AND PROCEDURE § 3-1, at 147 (6th ed. 2004).

accurate advisory opinion from the Marine Corps, and that the decision should have been to grant the relief he had sought. He asked that, rather than requiring further resort to the ERSB or other internal Marine Corps remedies, the BCNR simply grant make-whole relief itself, correcting his date of rank as a GySgt to July 1, 1993, with consequent promotion to Master Sergeant effective July 1, 1998, the fifth anniversary of the date on which he should have been promoted to GySgt in the first place. A.R. 266-70.

The Marine Corps responded that it had removed the office hours record from GySgt Pettiford's file, A.R. 189, and that he could request remedial consideration for all selection boards that may have been affected by it. A.R. 260-61.

On July 2, 2001, GySgt Pettiford requested ERSB consideration, A.R. 157, and on July 6, 2001, his commanding officer favorably endorsed his request, stating: "Approval of this will correct an unfortunate injustice. GySgt Pettiford is fully qualified to be a Master Sergeant of Marines." A.R. 156; *see also* A.R. 160-61, 163, 165, 283.

In September 2001, the ERSB agreed that GySgt Pettiford's promotion to GySgt should be made retroactive to November 1, 1994. A.R. 7. Thereafter, he applied to the BCNR for back pay, since the period of retroactivity exceeded that for which the Marine Corps can give backpay on its own. *Id.* The BCNR granted that request in November 2001. *Id.*

The ERSB did not rule, at first, on GySgt Pettiford's request for remedial promotion to Master Sergeant at the 1999, 2000 and 2001 regular selection boards. It finally did so on or about November 16, 2001, when a board consisting of only six voting members, of whom only five participated (rather than the minimum of nine required by MCO 5420.16C, Def. Ex. 2, Encl (1), at 3 (¶ 1.a.(6))) decided he should *not* be remedially promoted to Master Sergeant. A.R. 7, 19, 32, 329 (¶ 1), 329, 332-33, 338. In considering whether GySgt Pettiford should be remedially promoted as of

4

the 1999 regular selection board, the ERSB considered only a performance index ("PI"); it had access to his OMPF but not the OMPFs of any other Marines in making that determination for 1999. S15; S16; S18 (¶ 1); Def. Ex. 4 at 5 (¶ 11).

On November 23, 2001, having exhausted all of his remedies within the Marine Corps, GySgt Pettiford renewed his request for such relief from the BCNR. A.R. 6. His letter to the BCNR stated in pertinent part:

> There are two basic reasons the BCNR should grant remedial promotion to MSgt. *First*, the ERSB's proceedings were procedurally defective. *Second*, even if its procedures were valid, the result was arbitrary and capricious. We address each of these in turn.

1

**The ERSB's Decision was Procedurally Flawed**

> The ERSB failed to follow the required procedures. As explained in my May 25, 2001 letter [A.R. 186], including the enclosures, the Marine Corps does not conduct ERSBs in the proper, required manner. It does not in fact compare the records of Marines who are being considered for remedial promotion with records of those Marines with whom they would have competed before the regular selection boards. For example, when conducting a remedial review of the regular 1999 MSgt selection board, the ERSB should have reconstituted GySgt Pettiford's record to show his corrected GySgt date of rank (as per its September 2001 decision), and by removing any documents that did not exist as part of his record as of the date the regular 1999 MSgt board convened. Similarly, it had a duty to compare that record with the records of other GySgts with whom GySgt Pettiford would have competed before the regular 1999 MSgt board. And those records in turn would have had to be reconstituted to remove any documents that did not exist as part of the concerned Marines' records on the date they met the regular 1999 MSgt board. The process would then have to be repeated, if he was not selected for 1999 remedial promotion, with appropriate reconstitution of GySgt Pettiford's record and those of a sample of Marines who in fact were considered by the regular 2000 and 2001 MSgt boards.

> The documents furnished to us by the Marine Corps indicate that the Corps does not conduct ERSBs in this fashion. We have, for your information, addressed a further FOIA request to Headquarters, U.S. Marine Corps, in this regard, but we have done so only out of an abundance of caution, since there is no indication that the Corps altered the process followed by the ERSB between the time of our earlier FOIA request [*see* A.R. 243] and the time the ERSB considered GySgt Pettiford's latest request. As additional documentation is received from the Marine Corps, we

will forward it to you. A copy of our latest FOIA request [A.R. 104] is enclosed for your convenience.

There is no evidence that GySgt Pettiford's record was considered separately as to each of the three regular MSgt promotion boards with respect to which remedial consideration was required. This represents an error in itself, but the error is compounded by the fact that his record changed between the time of the 1999, 2000 and 2001 regular MSgt boards. There is no reason to believe that the ERSB had his record reconstituted to the condition it would have been in, separately, for each of those years. Among other things, additional fitness reports and a graduate certificate for telecommunications would have been added at various time[s] over the course of those years.

For these reasons and those previously stated, the ERSB's consideration of GySgt Pettiford for remedial promotion to MSgt must be voided.

2

**The ERSB's Decision was Arbitrary and Capricious**

In any event, the BCNR has the power and duty to review the merits of ERSB decisions. Here, the ERSB's decision is arbitrary and capricious in light of (a) this Marine's overall record (including two meritorious promotions, one to SSgt while on recruiting duty); (b) his earned B.S. degree while on active duty (an infrequent achievement for an enlisted Marine); (c) his progress toward an earned Master's degree (an even rarer achievement); and (d) the Commandant's repeated instruction to selection boards concerning the presumption that those who have completed a tour in recruiting are highly qualified (GySgt Pettiford has had two tours as a recruiter). [*E.g.*, A.R. 213 (¶ 8a), 222 (¶ 9a)]

Certainly nothing in GySgt Pettiford's record, as corrected, precluded his selection for MSgt, and while of course there was competition for promotion in 1999, 2000 and 2001, it was not so extraordinary as to render him noncompetitive. For example, according to the enclosed data for FY01, the selection rate was 62.8%. [A.R. 141, 172] Particularly since, under MCO 5420.16C, "the ERSB is not constrained by the selection allocations in effect as the time of the regularly scheduled board," it is disturbing, giving the regular boards' actual selection rates, that the November 2001 ERSB selected none of the four [*sic*; should read "three"; *see* A.R. 12 (¶ 5)] GySgts seeking remedial promotion to MSgt or 1stSgt. [A.R. 336-37]

Accordingly, the BCNR should now direct that GySgt Pettiford be promoted to Master Sergeant retroactive to MSgt effective November 1, 1998, since that is the date we believe he would have been promoted given his newly-established November 1, 1994 date of rank as a Gunnery Sergeant.

A.R. 7-9 (A.R. references in brackets added).

6

The case took several more years for the BCNR to resolve, largely because it had to be placed in suspense, A.R. 24, 96, 102, while GySgt Pettiford struggled to extract pertinent documents and straight answers out of the Marine Corps. A.R. 30-31, 33, 49-51, 54-58, 61-62, 73, 85-90. On June 1, 2002, he was transferred to the Fleet Marine Corps Reserve, A.R. 77-78, a status held by enlisted Marines who so desire from the time they complete 20 years' service until they are transferred to the retired list upon completion of 30 years' service. 10 U.S.C. §§ 6330-31.

In an October 16, 2002 advisory opinion to the BCNR, the Marine Corps claimed that it had compared GySgt Pettiford's record with those of other Marines within his Military Occupational Specialty ("MOS") who were considered by the original Sergeant Major (E-9) through Master Sergeant selection boards in 1999, 2000 and 2001. It asserted that "[t]his is accomplished by the use of comparison records maintained on file for each board held per calendar year." A.R. 23. By letter dated September 26, 2002, however, the Marine Corps had advised him that comparisons were made as to only two of the three annual cycles at issue in the case (2000 and 2001). A.R. 32.

On December 29, 2003, GySgt Pettiford filed with the BCNR the 10 comparison service records he had succeeded in prying out of the Marine Corps as those which the ERSB allegedly considered. A.R. 24. His submission stated in pertinent part:

> On October 29, 2002 I wrote to you in response to the Marine Corps' October 16, 2002 memorandum in GySgt Pettiford's case. Since that time we have continued to press the Marine Corps for the information we have been seeking for so very long. [A.R. 30-31, 33] It now appears that we have received everything we are likely to get—unless the BCNR directs the Marine Corps to make a further submission. I therefore request that you terminate the suspension of these proceedings.
>
> On July 16, 2003, the Marine Corps released to us five sanitized OMPFs [Official Military Personnel Files] against which GySgt Pettiford's record was apparently compared by the Enlisted Remedial Separation Board ("ERSB"). Months

7

later, five additional sanitized OMPFs were released to us in digital form. Copies of these 10 records are enclosed. We have the following comments:

1. It remains unknown how the Marine Corps actually conducted the ERSB proceedings. As explained in my October 29, 2002 letter to you [A.R. 14], a September 26, 2002 letter from Major J.A. Popielec, Head, Enlisted Promotion Section, asserts that comparisons were made as to only two of the three annual cycles that are at issue in this case (CY 2000 and CY 2001). [A.R. 32] On the other hand, his October 16, 2002 memorandum to the BCNR [A.R. 23] appears to claim that comparisons were performed by the ERSB in respect of all three regular boards, *i.e.*, CY 1999-2001, as opposed to the two boards as to which he made such a claim three weeks earlier. This inconsistency remains unexplained.[5]

2. Maj Popielec's October 16, 2002 memorandum also claims that comparisons are "accomplished by the use of comparison records maintained on file for each board held per calendar year." It follows that there would be no problem retrieving the comparison records on a per-calendar-year basis. But only 10 OMPFs were furnished to us. The clear implication is that they were the only comparison records the 2001 ERSB relied on. If so, then either (a) Maj Popielec's description of the Marine Corps' comparison-record maintenance practices is inaccurate, or (b) the ERSB took a short cut and made multiple-year comparisons against a single set of records, or (c) the Marine Corps failed to furnish us all of the comparison records that were actually used. The records furnished to us do not distinguish between the various regular selection boards the ERSB was supposed to replicate using a corrected OMPF for GySgt Pettiford.

3. The conclusion is inescapable that the ERSB did not, in fact, replicate the various regular boards separately, as it was required to, but instead—at best—performed a single review covering a number of years and pay grades. This corner-cutting may have saved time, but it means—fatally—that neither GySgt Pettiford's OMPF nor those with which the Marine Corps claims to have compared it were adjusted to take account of the changes that would have had to be made with the passage of time between the CY 1999 regular board, the CY 2000 regular board, and the CY 2001 regular board. See my letter of Mar. 27, 2002, at 3 (¶ 4). The June 20, 2002 advisory opinion claims (at 3 (¶ 4g)) that we are merely speculating in this regard. [A.R. 19] There are two answers to this assertion: the actual practice followed by the ERSB staff is a matter peculiarly within the Marine Corps' knowledge, and nothing has prevented the Marine Corps from refuting the point directly if the facts were other than as we have inferred. Second, nothing in the 10 sanitized OMPFs furnished to us gives the slightest reason to believe any such adjustments were made.

---

[5] In fact, GySgt Pettiford was supposed to be considered for remedial promotion in respect of *six* regular promotion boards—1999 IZ [In Zone] 1st Sgt and MSgt, 2000 IZ 1st Sgt, 2000 AZ [Above Zone] MSgt, 2001 IZ 1st Sgt, and 2001 AZ MSgt. [Footnote renumbered from original; bracketed explanations added.]

The corner-cutting referred to above also means that GySgt Pettiford's record was not compared with a proper sample of those against whom he actually competed before the original boards, in light of the fact that the pool of staff NCOs actually considered for promotion obviously changes from, year to year.

4. Finally, and even if the BCNR could disregard all of the foregoing defects, the 10 sanitized OMPFs provide no rational basis on which to conclude that GySgt Pettiford would have been found in the do-not-promote category for each and every one of the promotion cycles the ERSB was supposed to replicate based on his corrected OMPF. They are not identified in any way that would permit a reader to determine which of the 10 were selected (and by which regular board for which pay grade) and which were not selected. Are the 10 records really applicable to all six of the regular boards the ERSB was required to replicate? If so, how many of those 10 Marines were selected, and for which grade in which year? If any of them were selected, that would mean they would not have been considered for the next annual cycle? See my letter of Mar. 27, 2002, at 3 n.2. [A.R. 12 n.2] Were no others substituted? In any event, the Marine Corps has not drawn our attention to anything that would justify the decision of the ERSB, and the achievements of GySgt Pettiford make his failures of selection by the ERSB for each and every one of the six affected promotion cycles, one after another, profoundly improbable. We encourage the BCNR to secure *complete* copies of his OMPF and those against which he was in fact compared by the ERSB (with indication as to who was selected and who was not, and by which regular board) to see if it can determine any better than we can whether there is in fact a substantial basis for the ERSB's decision.

On May 6, 2004, relying on what Navy Litigation later correctly described as a flawed Marine Corps "AO" (advisory opinion), S14, the BCNR voted to deny GySgt Pettiford's application. A.R. 1, 4. In a brief letter decision sent the following day, the BCNR stated that it "substantially concurred with the comments contained in the advisory opinions." A.R. 2. Those advisory opinions necessarily did not address matter that was submitted on GySgt Pettiford's behalf after they were written. *Compare* A.R. 17 (Jan. 16, 2002), 19 (June 20, 2002), 23 (Oct. 16, 2002) (advisory opinions) *with* A.R. 14 (Oct. 29, 2002), 24 (Dec. 29, 2003) (GySgt Pettiford's subsequent submissions).

The BCNR's 2004 decision gave no indication of how it viewed GySgt Pettiford's responses to the advisory opinions or why it was not accepting his arguments. A.R. 2. It gave no

indication that the BCNR had compared GySgt Pettiford's record with any of the service records he had submitted, after having obtained them from the Marine Corps, much less that it had found him less qualified than others against whom he had allegedly been compared by the ERSB. A.R. 2.

On April 19, 2006, at the Secretary's request, Dkt. 13, after GySgt Pettiford cross-moved for summary judgment, Dkt. 8, the Court remanded the case to the BCNR for further proceedings, and denied the parties' dispositive motions without prejudice. Dkt. 16 and unnumbered Minute Order.

On April 11 and August 2, 2006, the Enlisted Program Section of Headquarters Marine Corps submitted advisory opinions to the BCNR purporting to further explain the process employed by the ERSB when it considered GySgt Pettiford's case. S16, S18. For 1999, the ERSB used the PI to compare GySgt Pettiford's performance with that of his peers. S16 (¶ 2), S18 (¶ 1). For 1999, the ERSB first considered GySgt Pettiford for promotion to First Sergeant and then to Master Sergeant, S16 (¶ 1), S19 (¶ 3), treating him as an in-zone candidate. A.R. 336, 338.[6]

The upper limit for PIs is 9.00. S16 (¶ 2); *see also* Def. Ex. 4 at 4 (¶ 6). GySgt Pettiford's PI was 8.95. S16 (¶ 2). In the two pertinent MOSs, 199 Marines who were promoted to First Sergeant and Master Sergeant by the 1999 regular selection board had PIs between 8.80 and 9.00. S16 (¶ 2); Def. Ex. 4 at 3-4 (¶¶ 5, 8); *see also* S8. One hundred seventy-nine (nearly 18%) of the 1002 eligible in-zone Marines with PIs between 8.80 and 9.00 were selected by the 1999 First Sergeant selection board. Def. Ex. 4 at 2 (¶ 3). One Marine who was promoted by the 1999 First Sergeant regular selection board had a PI between 8.59 and 8.40. S16 (¶ 2); Def. Ex. 4 at

---

[6] In-zone consideration is afforded to those sergeants or staff noncommissioned officers (SNCOs) who have not previously failed of selection and otherwise meet the requirements for consideration for promotion. Def. Ex. 4 at 3 (¶ 4h).

2(¶ 3), 3 (¶ 5).[7] Eighteen (nearly two-thirds) of the 28 eligible in-zone Marines with PIs between 8.80 and 9.00 were selected by the CY 1999 Master Sergeant regular promotion board. Def. Ex. 4 at 4 (¶ 6). The selection rate of in-zone eligible Marines in GySgt Pettiford's MOS (Utilities Maintenance Chief) at the CY 1999 Master Sergeant regular selection board was 64%. Def. Ex. 4 at 4 (¶ 6).

For 1999, the ERSB considered GySgt Pettiford's OMPF as well as his PI. Def. Ex. 4 at 5 (¶ 11). An OMPF includes the Marine's official photo, service record book, fitness reports, enlistment and reenlistment contracts, educational certificates and diplomas, awards and commendations, adjudicated derogatory material such as nonjudicial punishment, courts-martial or other adverse material such as counseling statements for poor performance or substandard conduct. Def. Ex. 4 at 4-5 (¶ 10).[8] The ERSB did not refer to the OMPF of that or any other Marine when deciding not to remedially promote GySgt Pettiford as of 1999. S16 (¶ 2); S18 (¶ 1); Def. Ex. 4 at 5 (¶ 11).

For 2000 and 2001, the Marine Corps' August 2, 2006 advisory opinion claimed that GySgt Pettiford's record was compared only with that of the Marines who were selected for promotion to First Sergeant and Master Sergeant with the fewest votes. S19 (¶ 4). GySgt Pettiford responded as follows, in pertinent part:

---

[7] The Secretary did not disclose the distribution of PIs within the 8.80—9.00 band for in-zone eligible Marines with GySgt Pettiford's MOS for the 1999 First Sergeant and Master Sergeant selection boards. *See* Def. Ex. 4 *passim.*

[8] Promotion boards also receive data from the Marine Corps' Total Force System, which includes physical fitness test scores, small arms qualification scores, professional military education, personal awards, and special skills or qualifications. Def. Ex. 4 at 5 (¶ 10).

1

**Failure to Review GySgt Pettiford's Naval Record**

Paragraph 2 of the Board's June 23, 2006 letter advised the Enlisted Pro-
motions Section that, among other things, it "needs to reevaluate [GySgt Petti-
ford's] naval record . . . ." As I assume you noticed, the advisory opinion gives no
indication, directly or by implication, that the Marine Corps did so.

2

**The 1999 ERSB**

The advisory opinion makes it clear that the 1999 ERSB was invalid. No
effort was made to compare GySgt Pettiford's record with any other Marine's re-
cord—a question the Board specifically (and properly) asked in ¶ 3a of its June
23, 2006 letter. That the ERSB process even then was required to be comparative
is clear from evidence we previously submitted—a Marine Corps website posting
on this subject, a copy of which appears in the administrative record ("A.R.") that
was filed with the District Court. *See* A.R. 191-92 (board weighs Marine's overall
performance "against the performance of those originally selected for promo-
tion").

The Board can make no informed judgment about the 1999 ERSB without
more information about the Performance Index ("PI"). Precisely how are PIs cal-
culated? What was GySgt Pettiford's PI? What PI was needed to be promoted?
Paragraph 3a of the Board's June 23, 2006 letter made it clear that it needed de-
tails concerning the PI. The Marine Corps has not provided any. Simply to assert,
as the advisory opinion does in ¶ 1, that the PI "is a statistics rating system" the
intent of which was "to provide board members with a tool to statistically meas-
ure the performance of Marine being considered for promotion" adds nothing to
the conversation. (The last sentence of ¶ 1 of the advisory opinion simply parrots
back the leading question posed by the Board in the last sentence of ¶ 3a of the
June 23, 2006 letter. Answers that do so are without probative value, and leading
questions such as the one cited suggest that the case is in fact not being afforded a
fresh look.)

3

**The 2000-2001 ERSBs**

These boards were plainly invalid. They are examples of the Zen question,
"What is the sound of one hand clapping?" As we read ¶ 4 of Major McLaugh-
lin's memorandum, GySgt Pettiford's record was compared against only one Ma-
rine in respect of each of these years for First Sergeant and only one other Marine

in respect of each of these years for Master Sergeant.[9] That makes a total of four comparison records. If so, why were we sent *10* Marines' records in 2004 when we asked for the records against which his was compared? *See* Letter from Teresa D. Ross, Head, Freedom of Information/Privacy Act Sections, Security Programs and Information Management Branch, to Eugene R. Fidell, July 11, 2003 (enclosed) (transmitting first five records; "We have *verified* that GySgt Pettiford was rated against *10* other Marines" during the ERSB held on or about November 16, 2001) (emphases added); *see also* A.R. 32 (copies of comparison records used in ERSB case of GySgt Pettiford "were already provided to Freedom of Information Act office at Headquarters Marine Corps"). This discrepancy with respect to a material fact is neither acknowledged nor resolved in the latest advisory opinion.

I request that the Board obtain from the Marine Corps and provide to us sanitized copies of the records of the Marines against which GySgt Pettiford's record was specifically compared in 2000 and 2001. I ask that the Board and we receive them in the form in which they were considered by the ERSB, and that they be labeled clearly so the Board and we can tell which were the comparison records for each of the 2000 reconsiderations (First Sergeant and Master Sergeant) and which were the comparison records for each of the 2001 reconsiderations (First Sergeant and Master Sergeant). Also, please have the Marine Corps submit separate copies of GySgt Pettiford's own record in the precise form in which it was considered by the 1999, 2000 and 2001 ERSBs.

Do I correctly understand the last sentence of ¶ 4 of the advisory opinion to state that every single Marine considered by the regular 2000 and 2001 First Sergeant and Master Sergeant Boards *was* selected? That cannot be correct, since data already in the record indicate that the FY01 selection rate was 62.8%. A.R. 141, 172. If the cited sentence was intended to refer to the records of Marines being afforded remedial consideration in respect of the 2000 and 2001 boards, then it appears to suggest that GySgt Pettiford's record was compared not with those of staff NCOs against whom he competed at the regular 2000 and 2001 boards, but with those of staff NCOs whose cases were also receiving *remedial* consideration by the very same ERSB—which would make the entire exercise circular. The comparison had to be with those whose records *were* properly considered by the original boards, not among those receiving remedial consideration.

---

[9] For Major McLaughlin's account to be accurate, there would have been *two* different Marines' records for each year. This is because, according to him, the comparison records were those of Marines who had been selected. If a Marine had been selected for First Sergeant, he or she would not have even been considered for Master Sergeant, and hence his or her record would not have met Major McLaughlin's description for the comparison record used. [Footnote in original; renumbered.]

But let us assume that the advisory opinion means what it seems to say in this respect. That would mean that, notwithstanding a 100% selection rate, GySgt Pettiford was still not selected. If that is the case, surely the Marine Corps should be required to furnish some explanation.

Alternatively, does the cited sentence of the advisory opinion mean only that there were some non-selects, but GySgt Pettiford's record was not compared with any non-select's record in either 2000 or 2001 for either First Sergeant or Master Sergeant?

Paragraph 2 of the advisory opinion asserts that an ERSB is not confined to any particular number of allocations. If so, the fact that the ERSB ranked GySgt Pettiford below the selectee with the lowest number of favorable votes was in fact the imposition of a limit. That is, if the comparison was indeed with the promoted Marine with the fewest favorable votes, and if the Marine receiving remedial consideration is deemed below that person, then the procedure by definition imposes a limit: the number previously selected by the regular board. Whether a Marine undergoing ERSB consideration is Fully Qualified is not a function of whether he or she ranked below the lowest-ranked selectee under the Best and Fully Qualified criterion. The methodology described by the advisory opinion was therefore at war with a central assertion in the advisory opinion: that there was no limit on how many ERSB candidates could be promoted, as the limit was literally built in. . . .

*Conclusion*

Based on the advisory opinion, the ERSB's decisions not to promote GySgt Pettiford cannot be sustained. Given the extreme passage of time, the continuing inadequacy and discrepancies in the Marine Corps' submissions, and the defects that are already clear, the time has come for the BCNR either to direct a new ERSB for the 1999, 2000 and 2001 promotion boards or to recommend that the Secretary promote GySgt Pettiford to Master Sergeant effective November 1, 1998 without further delay. As indicated in ¶ 4 of my letter to you dated December 29, 2003, A.R. 24, 26, there is no rational basis, based on the comparison records previously furnished to us and supplied by us to the BCNR, on which to conclude that GySgt Pettiford would have been found in the do-not-promote category for each of the boards the ERSB was to have replicated based on his correct record. . . .

S21-25.

On November 16, 2006, without notice to GySgt Pettiford, the BCNR asked agency counsel handling the litigation in this Court whether Navy Litigation would support affording

GySgt Pettiford another remedial consideration for promotion to pay grade E-8, and was told that Navy Litigation would not do so. S42.

On November 20, 2006, counsel for GySgt Pettiford responded in depth to the last of the Marine Corps' advisory opinions, pointing out, among other things—

(a) "it would be amazing" if every one of the 199 Marines who was selected by the 1999 regular selection board with a PI between 8.80 and 9.00 ranked above him (with an 8.95 PI), "given anything approaching a normal distribution"; and

(b) as to the 2000 and 2001 regular selection boards—

(i) it was impossible to find a rational basis for distinguishing GySgt Pettiford's record from those of Marines who were promoted; and

(ii) the ERSB failed to examine the fitness reports—the key document in competitive military promotions—of the Marines with whom GySgt Pettiford was compared;

On July 16, 2007, the BCNR again denied GySgt Pettiford's application. S3. Its decision recited:

> The Board found it unobjectionable that a performance index (PI) was used for the CY 1999 ERSB, noting the PI was not used alone, but in conjunction with your Official Military Personnel File. The Board found the information MMPR-2 provided about the use of the PI was sufficient. The Board found the MMPR-2 advisory opinion dated 2 August 2006 was correct as to the number of Marines with whom you were compared, despite the indications, in the enclosure to your counsel's letter of 17 August 2006, that the CY 2001 ERSB rated you against 10 other Marines. In this regard, the Board considered MMPR-2 a more reliable source within HQMC, for this purpose, than the Head, Freedom of Information/Privacy Act Sections, who provided the enclosure to counsel's letter. Further, the Board considered it unlikely that MMPR-2 would have understated the number of records with whom yours was compared, when asserting a larger number could have bolstered the validity of the proceedings in question. The Board found that every Marine considered by the regular CY 2000 and 2001 First Sergeant and Master Sergeant Selection Boards who was in your military occupational specialty was selected for promotion, whereas the overall selection rate was much lower. The Board did not agree with your argument that your not having

been selected by the ERSB's was inconsistent with the principle that ERSB's are not limited to a particular number of allocations.

Finally, the Board found your record for all three ERSB's in question included the following substantial information supporting their determination not to select you for promotion: service record page 11 ("Administrative Remarks (1070)") counseling entries dated 12 October 1984 and 9 December 1985; derogatory fitness reports for 19 October to 20 December 1982 and 1 April to 29 October 1983; and nine fitness reports showing peers ranked above you (20 January to 31 March 1983, 16 December 1983 to 13 April 1984, 14 April to 28 August 1984, 1 April to 7 August 1985, 31 July to 31 October 1987, 17 June to 31 December 1989, 1 January to 31 December 1990, 1 January to 3 August 1993 and 1 November 1997 to 30 September 1998).

S4-S5.

On March 17, 2008, the Court denied GySgt Pettiford's motion to strike Def. Ex. 4. Dkt. 28.

### Standard of Review

The Court reviews BCNR decisions "in light of familiar principles of administrative law." *Piersall v. Winter*, 435 F.3d 319, 321 (D.C. Cir. 2006), quoting *Kreis v. Sec'y of the Air Force*, 866 F.2d 1508, 1511 (D.C. Cir. 1989). These include the usual APA requirements that agency decisions not be arbitrary and capricious or contrary to law, and that they be supported by substantial evidence. *Chappell v. Wallace*, 462 U.S. 296, 303-04 (1983); *see also, e.g., Frizelle v. Slater*, 111 F.3d 172, 176 (D.C. Cir. 1997).

### Argument

### I

### THE COMPLAINT STATES A CLAIM ON WHICH RELIEF MAY BE GRANTED

The Secretary's contention (at 5) that the complaint does not state a claim on which relief may be granted is mistaken. The Supreme Court confirmed in *Chappell, supra*, that correction

board decisions are reviewable, and the records of this and every other Circuit are replete with ex-
amples of the application of conventional principles of judicial review of such decisions pursuant to
the APA. *E.g., Kreis, supra; Frizelle, supra.* The issues GySgt Pettiford has raised with respect to
the agency proceedings here on review are plainly justiciable. We have never asked—and do not
ask now—that the Court substitute its judgment for that of either the ERSB or the BCNR.[10] What
we have done is show—*see* Points II and III *infra*—that the agency decision on review is arbitrary
and capricious, an abuse of discretion, unsupported by substantial evidence, and contrary to law. We
have demonstrated that the reasons supplied by the BCNR for turning down GySgt Pettiford's ap-
plication fall far below the demands of the APA. We have also pointed to the Secretary's own data
that show GySgt Pettiford's application should not have been denied. Finally, we have pointed out
that the ERSB lacked the minimum number of members expressly required by the governing Ma-
rine Corps regulation.

The Secretary claims (at 6) that promotion, which is one of the alternative forms of relief
sought, sought is beyond the Court's power. *Kreis,* on which he chiefly relies for the proposition
that a court cannot direct a promotion, involved a commissioned officer, and hence implicates the
unique power of the President to grant commissions. U.S. Const. art. II, § 2; *see, e.g., Dysart v.
United States,* 369 F.3d 1303 (Fed. Cir. 2004). Even as to officers, however, there are situations in
which a court can order a promotion.[11] But this case involves an enlisted member and accordingly

---

[10] The military expertise needed for evaluating GySgt Pettiford has already been exercised. For
CY 1999, the smaller-than-required ERSB focused on the PI, which is a numerical value itself
derived from evaluations by military superiors and other matters of record; the military expertise
is thus built into the PI. It thus does not take a uniform to be able to say that a person with a
higher PI than others who have been promoted should himself be promoted. It obviously does
not take one to determine that the voting-membership minimum was not satisfied.

[11] *E.g., Voge v. United States,* 11 Cl. Ct. 510, 514 (1987), *aff'd in pertinent part,* 844 F.2d 776,
782 (Fed. Cir.); *Moore v. United States,* 5 Cl. Ct. 457 (1984); *Laningham v. United States,* 5 Cl.

stands on a different footing.

The logical consequence of the principal relief the complaint seeks—an order setting aside the decisions of the BCNR and ERSB—is retroactive promotion to E-8. The Supreme Court has said that the BCNR can order such a promotion. *Chappell, supra*, at 303. If, however, this Court concludes that the actions of the ERSB and BCNR do not, as we explain in Points II and III, satisfy the requirements of the APA, then the case should be remanded to the BCNR for further proceedings under a proper set of instruction from the Court. GySgt Pettiford is a very patient person. It is a shame that this case has consumed as much time as it has, but he is willing to continue to be patient. We are confident that if all the Court does is order further proceedings free of the defects to which we point in this cross-motion, the Secretary will do the right thing and ensure that the ERSB and BCNR reconsider this case in a fair, proper, and lawful manner that will, in the event it is again adverse to GySgt Pettiford, meet the normal requirements of judicial review.

II

THE ERSB PROCEEDINGS WERE INVALID BECAUSE THE
ERSB LACKED THE REQUISITE NUMBER OF MEMBERS

Prompted by the Secretary's claim that the BCNR had determined that the ERSB was properly convened, Def. Statement of Material Facts ¶ 33, we reexamined both the BCNR's decision and the proceedings of the ERSB. The BCNR made no such determination. S3-5. Worse yet, it could not have done so.

MCO 5420.1C, Def. Ex. 2, Encl (1), at 3 (¶ 1.a.(6)), required the ERSB to have nine vot-

---

Ct. 146, 149-53 (1984); *Schuenemeyer v. United States*, 4 Cl. Ct. 649, 652 (1984); *Alford v. United States*, 3 Cl. Ct. 229, 231 (1983); *Skinner v. United States*, 594 F.2d 824, 830 (Ct. Cl. 1979); *Selman v. United States*, 498 F.2d 1354, 1358 (Ct. Cl. 1974) (collecting cases), cited in *Doggett v. United States*, 207 Ct. Cl. 478, 482 (1975); *Hertzog v. United States*, 167 Ct. Cl. 377 (1964); *see also Arens v. United States*, 24 Cl. Ct. 407, 414-15 (1991), *rev'd on other grounds*, 969 F.2d 1034 (Fed. Cir. 1992).

18

ing members, but the ERSB consisted of only six voting members, A.R. 329 (including Lt Col Smith), of whom only five participated. A.R. 332-33 (omitting Lt Col Smith). Because this violated the governing regulation, its proceedings as to all three years—CY 1999, 2000 and 2001— were contrary to law.[12]

Although not identified before (or noted by) the BCNR, the point arises from an incorrect assertion in the Secretary's moving papers and involves per se error that requires neither evidentiary development nor agency expertise to evaluate. We therefore ask that the Court take notice of it in the interest of justice.[13] If for any reason the Court is not disposed to rule on the issue itself and remand with instructions to reconvene the ERSB with the requisite number of voting members, it should certainly remand to the BCNR so that body may address it. Such a remand would be only fair, since the Secretary was allowed one in 2006 when he identified a defect in the BCNR's proceedings, and would render it unnecessary now—and possibly forever—for the Court to address any other issue in the case. We invite the Secretary to support a remand to the ERSB or, failing that, a remand to the BCNR for further proceedings, in keeping with the BCNR's (and his own) broad remedial responsibility under 10 U.S.C. § 1552. *Duhon, Caddington, Thomas, all supra.*

---

[12] In contrast, the predecessor board (known as the Enlisted Remedial Promotion Board, or ERPB) that sat in 1996, and was also required to have nine voting members present when cases are considered, Def. Ex. 1, Encl (1), at 2 (¶ 1.a.(7)), A.R. 230, did satisfy that requirement. *See* A.R. 241. (The reference to MCO 5420.16*A* at A.R. 241 appears to be a typographical error, since MCO 5420.16*B* was in effect in 1996. In any event, the "Summary of Revision" found in MCO 5420.16B, Def. Ex. 1, at 1 (¶ 7), A.R. 227, suggests that the minimum number for voting members required to be present did not change between those two versions.)

[13] Out of an abundance of caution we request leave to amend the complaint if need be, and have submitted herewith a proposed Second Amended and Supplemental Complaint to that end.

III

## THE BCNR'S REFUSAL TO GRANT RELIEF WAS ARBITRARY AND CAPRICIOUS, AN ABUSE OF DISCRETION, UNSUPPORTED BY SUBSTANTIAL EVIDENCE, AND CONTRARY TO LAW

A

*Navy Litigation should not have been involved
in the BCNR's proceedings on remand*

The Secretary has correctly discerned (at 25) that the basis for GySgt Pettiford's claim that the BCNR abdicated its responsibility is the evidence that Navy Litigation—uniformed personnel— were in large measure calling the shots when this case was before the BCNR on the voluntary remand.

Uniformed lawyers from the Judge Advocate General's General Litigation Division attorneys serve as "agency counsel" in this litigation. Major Anthony C. Williams' name appears on one of the Secretary's pleadings. Dkt. 15. According to the contemporaneous record, Brian J. George, head of the BCNR's Performance Section and the staff member who was chiefly responsible for GySgt Pettiford's case and wrote the BCNR's 2007 decision (his initials appear above the date, S3), telephoned Major Williams of "JAG Lit." They "discussed whether or not JAG would sup[por]t giving Pet[itioner] another remedial consid[eration] for prom[otion] to [pay grade] E-8." S42. Major Williams "answered in the negative." Use of the term "answered" clearly indicates that Mr. George had put that question to him. Major Williams sent the BCNR a list of questions for the Marine Corps to answer on the remand. S8-9. He was allowed to review the BCNR's questions in draft, S30, and the BCNR made the change he suggested (including a typographical error). *Compare* S30 *with* S27 (¶ 3a). GySgt Pettiford and counsel were unaware of this interaction until they received the Supplemental Administrative Record. *See* 10 U.S.C. § 1556.

Navy Litigation's influence over the conduct of the remand was improper. The Secretary is required by § 1552 to act through civilians, not uniformed attorneys. The fact that the matter was in litigation did not alter the arrangement that had to be followed during the BCNR's proceedings on remand. Moreover, it could not be clearer that the BCNR, through its key staff member, was effectively deferring to the uniformed lawyers on the central issue of whether—as GySgt Pettiford asked—the ERSB would reconsider his case.

Contrary to the Secretary's implication, Navy Litigation was not "opposing counsel" before the BCNR. Hence, his claim that Mr. George was merely "reaching out" in an evenhanded way merely "to determine their position on the status of the case" is wide of the mark. We, for example, were never consulted on the draft questions to be sent to the Marine Corps. The contemporaneous record makes it clear that Navy Litigation—which was obviously advising Mr. George—was opposed to letting the ERSB reconsider, and that of course how the matter unfolded . . . unbeknownst to GySgt Pettiford until after we were back in court. Except as provided in 10 U.S.C. § 1555, which does not extend to personnel of the JAG's Litigation Division who are not assigned permanently and on a full-time basis to the BCNR, it is improper to involve a member of the uniformed Navy in the civilian record-correction process. *Proper v. United States*, 154 F. Supp. 317, 326 (Ct. Cl. 1957).

Ordinarily this error would lead us suggest that the decision of the BCNR be set aside and the case again remanded with instructions to reconsider GySgt Pettiford's application without input from Navy Litigation. As we now explain, however, relief on the merits is required, even without regard to the ERSB's failure to include the minimum number of voting members.

B

*GySgt Pettiford is entitled to relief as to the CY 1999 ERSB*

As to the CY 1999 ERSB,[14] GySgt Pettiford is plainly entitled to relief because of the procedures employed by the ERSB and in light of the data in the A.R. as well as—ironically—Defendant's Exhibit 4. Because relief with respect to the CY 1999 ERSB would render it unnecessary for the Court to address the deficiencies with respect to the CY 2000 and 2001 ERSBs, the Court need not address those matters. If for any reason it concludes that GySgt Pettiford is, contrary to our submission, not entitled to relief as to the CY 1999 ERSB, he is nonetheless entitled to relief as to the subsequent ERSBs, for the reasons we explain in Points II *supra* and III(C) *infra*.

At long last, it appears that the Marine Corps has been able to render something approaching a comprehensible account of how the ERSB functioned in November 2001, when it reconsidered GySgt Pettiford's CY 1999, 2000 and 2001 failures of selection. For 1999, the ERSB used the PI system, under which the ERSB had GySgt Pettiford's PI (a number) and his OMPF. It also had the PIs of other Marines who were considered for promotion by the regular CY 1999 selection board.

The data in the Secretary's Exhibit 4 demonstrate that GySgt Pettiford's PI was certainly higher than that of a Marine who was promoted on an in-zone consideration. At 8.95, his PI was at the high end[15] of the 8.80 to 9.00 band in which the percentage of eligible in-zone Marines selected was very high. On these data, the burden is clearly on the Secretary to show by substantial evidence

---

[14] The parties have tended to refer to the CY 1999, 2000 and 2001 ERSB proceedings as if they were separate. In fact, the same individuals performed the ERSB function in respect of all three years, rendering a single report. A.R. 332-39.

[15] The Secretary has not submitted any evidence from which a reader could determine how many in-zone Marines in that band had PIs below GySgt Pettiford's 8.95.

a cogent basis for not promoting him.[16]

The ERSB did not state any reasons for refusing to recommend promotion based on the CY 1999 board, but the BCNR tried to salvage the ERSB's action by pointing to what it described as "substantial information supporting [the ERSB's] determination not to select [GySgt Pettiford] for promotion." S4-5. In the absence of any explanation whatever from the ERSB, this was utter guess-work on the BCNR's part, and impermissible for that reason alone. But even if the ERSB had been motivated by the selective information to which the BCNR pointed, it would not assist the Secretary here.

The BCNR cited information from GySgt Pettiford's OMPF.[17] But the ERSB process is comparative, and such a process must take care to compare apples and apples. The only OMPF the ERSB had before it was GySgt Pettiford's. It therefore could not have made a comparative decision on any basis other than the PI, and as a result the BCNR could not uphold the ERSB's action in reliance on anything in his OMPF. Nothing in the BCNR's decision attempts to compare his OMPF with that of any Marine with whom he would have competed had he been considered by the regular CY 1999 selection board. In an inherently comparative process, it was patently improper to go beyond the PI only for GySgt Pettiford, and consider whether there might be blemishes in his record

---

[16] The Secretary suggests (at 17) that the selection rate data somehow show that the CY 1999 ERSB considered matter other than PIs. This is a *non sequitur*. We also respectfully invite the Court's attention to the fact that the selection rate percentages we have provided are more closely tailored to GySgt Pettiford's case, since we have used only the data for personnel who were in-zone.

[17] The OMPF is not in the A.R., even though the BCNR relied on it. *See* S3; *see also* A.R. 2. Prior to the remand, we did not consider it necessary that it be included in a Supplemental A.R., but we had no objection to the Court's requiring its submission. Dkt. 8, Feb. 9, 2006 Br. at 2 n.4. Since, on remand, the BCNR relied explicitly on matter found only in the OMPF, it should be before the Court, and we request that it be filed subject to compliance with the usual privacy requirements. Redacted copies of the pages the BCNR selectively relied on are attached.

without subjecting the comparison cases to the same level of scrutiny using the same database.

In its effort to get past the inconvenient truth that GySgt Pettiford's PI was higher than others who were promoted, the BCNR pointed unfairly to two counseling entries (from 1984 and 1985), derogatory fitness reports from 1982-83 (*16-17 years before the CY 1999 regular promotion board*), and "nine fitness reports showing peers ranked above" him (from 1983 to 1998). S4-5. As the Court will see from the attached copies, the first of the counseling entries relates to a minor matter some 15 years before the CY 1999 promotion board met. That matter did not result in any disciplinary action. The second entry, from a year later, concerned his duty to pay support in accordance with a court order arising from his divorce.

As for the two derogatory fitness reports, the earlier, from 1982 (17 years before the CY 1999 board), is certainly unflattering but covers only two months. The second, from 1983, covered what the Reviewer, in attached additional comments not mentioned by the BCNR, described as a relatively short period. He also observed that GySgt Pettiford's transfer "appears to be prejudicial and only based on a report that his new command may under other circumstances not have even seen." The Reviewer also noted that he questioned the marks on the initial version of the report and encouraged him to reconsider his evaluation of GySgt Pettiford's performance. None of this comes through in either the BCNR's terse citation of these reports or the Secretary's brief.

Passing over the question of staleness (which the BCNR seemed not to take into account) and the fact that the BCNR unfairly tipped the scales by searching only for negative information and made nothing of the many highly favorable things in GySgt Pettiford's OMPF, it adds nothing to say that he had "peers ranked above" him at various times in the past unless there is evidence that he was so low comparatively that he could not have been promoted. The BCNR made no such find-

ing[18] and could not have done so because there is no evidence in the record to support it. Indeed, GySgt Pettiford's high PI in itself casts grave doubt on any such claim. Moreover, it is difficult to take seriously any suggestion that the fitness reports and counseling statements the BCNR cherry-picked made him "road kill" for promotion purposes: he was in fact selected for promotion to Gunnery Sergeant in 1996, A.R. 304, when all but the last of the documents relied on by the BCNR to rationalize the ERSB's unexplained action would have been in his OMPF. His record obviously could not have been all that bad.

In any event, is not enough, as the BCNR did, to comment only on GySgt Pettiford's record. *Cf. Chicago Professional Sports Ltd. Partnership v. National Basketball Ass'n*, 95 F.3d 593, 598-99 (7th Cir. 1996) ("league with one team would be like one hand clapping"). Without comparable information about the other Marines, it is impossible to say how he fares as against others. *Engels v. United States*, 678 F.2d 173, 178 & n.13 (Ct. Cl. 1982); *Quinton v. United States*, 64 Fed. Cl. 118, 126-27 (2005). To act without such information is to engage in guesswork or intuition, which is forbidden. *Ridgely v. Marsh*, 866 F.2d 1528, 1529 (D.C. Cir. 1989); *Quinton, supra*, at 127.

For these reasons, the BCNR's failure to grant relief as to the CY 1999 ERSB does not satisfy the standards prescribed in the APA and must be set aside.

C

*GySgt Pettiford is entitled to relief as to the CY 2000 and 2001 ERSBs*

Because GySgt Pettiford is entitled to relief in respect of the CY 1999 ERSB, there is no need for the Court to address the CY 2000 and 2001 ERSBs. We will, however, briefly set forth

---

[18] The BCNR thought it unnecessary even to obtain a copy of GySgt Pettiford's record as it appeared for the CY 1999, 2000 or 2001 ERSBs. S4.

why the BCNR erred in failing to grant relief as to those boards—the ERSB's fatal membership defect aside.

First, the BCNR failed to examine the pertinent documents. Its decision recites that it had "determined that [GySgt Pettiford's] case could be denied properly . . . without obtaining sanitized copies of records of Marines against whom [he] competed . . . ." S4.[19] Although the CY 1999 ERSB relied on the PI (and had only his OMPF available to it), the CY 2000 and 2001 ERSBs had only OMPFs to go by. According to the Marine Corps, those boards had GySgt Pettiford's entire OMPF, but only parts of the OMPFs of the lowest-number-of-votes selected Marines against whom he was to be compared.[20] *Neither the ERSB nor the BCNR had the fitness reports of any Marine other than GySgt Pettiford.* Accordingly, there is, once again, an apples-and-oranges problem. An agency cannot play favorites, *e.g.*, *Monti v. United States*, 223 F.3d 76, 79 (2d Cir. 2000); *Estate of Aitken v. Shalala*, 986 F. Supp. 57, 63 (D. Mass. 1997), but that is

---

[19] This assertion is totally baffling since GySgt Pettiford had submitted to the BCNR the sanitized records he eventually received from the Marine Corps. A.R. 24. The Secretary claims (at 24) that "[t]he BCNR correctly refused [GySgt Pettiford's] request" that these records be used as comparisons in its July 2007 review, but never explains why that refusal is correct. The Secretary insists (at *id.*) that the 10 sanitized records furnished by the Marine Corps "would not provide the BCNR with a basis to determine that the CY 2000 and CY 2001 ERSBs' decisions resulted in an injustice." But how could the BCNR know that without examining the records? An agency action that disregards pertinent data—as these records certainly were—cannot withstand APA scrutiny. *E.g.*, *Tourus Records, Inc. v. Drug Enforcement Administration*, 259 F.3d 731, 736 (D.C. Cir. 2001) (duty to examine relevant data), quoting *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[20] The CY 2000 and 2001 ERSBs were instructed to use the "fully qualified" standard rather than the regular selection boards' "best and fully qualified" standard, A.R. 331 (¶ 6), because the ERSB "is not subject to the limitations of promotion percentage or authorized selection numbers which are ordinarily applicable to regularly scheduled selection boards." A.R. 330 (¶ 5a); *see also* A.R. 20 (¶ 3d), 177 (¶ 1b.(4)). The process, however, remained a comparative one. A.R. 21 (¶ 3f), 177 (¶ 1b.(4)), 330 (¶ 5b). The ERSB's opinion that the "selects" whom they recommended "represent the *optimum* in professional achievements in all respects," A.R. 332 (¶ (b)) (emphasis added), strongly suggests that the members in fact disobeyed the requirement to look only at whether the candidates were "fully qualified."

what the ERSB and BCNR effectively did when they put GySgt Pettiford's record under a microscope different from the one used to consider others with whom he was supposed to be compared. Like an SSB, an ERSB is required to compare Marines, but subjecting one Marine's record to more exacting scrutiny than another's makes a mockery of the very concept of comparison.

There are other deficiencies in the BCNR's treatment of the CY 2000 and 2001 ERSBs as well. For example, the BCNR thought it pertinent "that every Marine considered by the regular CY 2000 and 2001 First Sergeant and Master Sergeant Selection Boards who was in [his] military occupational specialty was selected for promotion, whereas the overall selection rate was much lower." S4. If anything, this factor helps rather than hurts GySgt Pettiford, since the fact that everyone in his MOS was selected would tend to suggest that his chances for selection were—or should have been—exceptionally strong.

Finally, the BCNR decided to dispense with an evidentiary hearing despite the fact that the record was (and remains) in a total fog as to the number of records against which GySgt Pettiford's was compared by the CY 2000 and 2001 ERSBs. The record includes a document from Marine Corps Headquarters that attests that the sender had "*verified* that GySgt Pettiford was rated against 10 other Marines. . . ." S26 (emphasis added). That was in 2003. The BCNR decided, however, that another Marine Corps letter from *three years later* (and not written by anyone actually involved in the November 2001 proceedings of the ERSB) was more reliable. So far as the record reveals or the decision indicates, the BCNR took no steps to determine how the head of the Marine Corps' FOIA/Privacy Act office had "verified" the information in her 2003 letter. Instead, it simply concluded that it was unlikely that office that had given out inconsistent information "would have understated the number of records with whom [GySgt Pettiford's] was

27

compared, when asserting a larger number could have bolstered the validity of the proceedings in question." S4.

The Secretary argues that the governing ERSB regulation called for comparison of GySgt Pettiford's record only with the successful candidate with the fewest votes. Comparing it with more records would not make the case stronger for the Secretary. If anything, it would show that the regulation had not in fact been complied with. Moreover, as between the Marine Corps' Enlisted Promotion Section and its FOIA/Privacy Act office, it would seem that the latter was the more disinterested of the two. Indeed, to the extent that inflating the number would have created more work for the FOIA/Privacy Act office, that office lacked a motive to fabricate just as much as the BCNR claims the personnel office did. In short, this part of the BCNR's rationale is fallacious.

Mindful of the BCNR's broad discretion in determining when to conduct an evidentiary hearing, *e.g., Amato v. Chafee*, 337 F. Supp. 1214, 1219 (D.D.C. 1972), its failure to hold a hearing at which percipient witnesses could be called to testify was an abuse of discretion given the square conflict in the Marine Corps' pronouncements on a simple question of fact. In addition, the conclusion the BCNR reached with respect to the number of OMPFs with which GySgt Pettiford's was compared does not rest on substantial evidence on the whole record (including adverse evidence), as the APA requires. "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also, e.g., Synergy Gas Corp. v. NLRB*, 19 F.3d 649, 651 (D.C. Cir. 1994).

For these reasons, the BCNR erred in failing to grant relied with respect to the CY 2000 and 2001 ERSBs.

*Conclusion*

For the foregoing reasons, the Secretary's Motion to Dismiss or, in the Alternative, for Summary Judgment should be denied and GySgt Pettiford's Renewed Cross-Motion for Summary Judgment and Motion for Leave to File Second Amended and Supplemental Complaint should be granted. A judgment should issue setting aside the decisions of the ERSB and BCNR and remanding with instructions that the ERSB reconsider GySgt Pettiford's record for CY 1999, 2000 and 2001 with the requisite number of voting members, and, if he is again not selected, that the BCNR receive and consider such other submissions as he may make. The Secretary should be required to complete and file the results of such proceedings no later than 120 days from the date of judgment.

In the alternative, a judgment should issue setting aside the decisions of the ERSB and BCNR, directing the Secretary to correct GySgt Pettiford's record to show that he was remedially promoted to Master Sergeant as of the date he would have been promoted if selected by the 1999 regular selection board (or, further in the alternative, remanding with instructions that the BCNR reconsider his case without the errors identified in Point III *supra*), and granting such other and further relief as may in the circumstances be just and proper.

Alternative proposed orders are submitted herewith.

Respectfully submitted,

/s/ Eugene R. Fidell
Eugene R. Fidell (112003)
Matthew S. Freedus (475887)
Feldesman Tucker Leifer Fidell LLP
2001 L Street, N.W., Second Floor
Washington, DC 20036
(202) 466-8960

*Attorneys for Plaintiff*

**March 31, 2008**